633 So.2d 846 (1994)
SUCCESSION OF Richard A. DOWLING.
No. 93-CA-1902.
Court of Appeal of Louisiana, Fourth Circuit.
February 25, 1994.
*847 Marcel Garsaud, Jr., Marion W. Weinstock, Gordon, Arata, McCollam & Duplantis, L.L.P., New Orleans, for plaintiff-appellant (Marion G. Welborn).
Charles G. Merritt, New Orleans, for defendant-appellee (Pat Andres).
Joseph S. Kluchin, Jr., New Orleans, for defendant-appellee (Austin Anderson).
Audrey Langois Lind, In Pro. Per., defendant-appellee.
Kathleen Dowling Hite, In Pro. Per., defendant-appellee.
Before BYRNES, LOBRANO and WALTZER, JJ.
LOBRANO, Judge.
Marion G. Welborn filed suit to annul a statutory will executed by her uncle, Richard A. Dowling. The trial court held that the will was a valid statutory testament and dismissed Welborn's suit.

FACTS:
Richard A. Dowling was a prominent New Orleans attorney and former District Attorney of Orleans Parish. He died on December 26, 1985. He left a will in statutory form dated March 16, 1985. His wife predeceased him and he had no children. He was survived by a sister, nieces, nephews and grandnieces from a predeceased nephew.
In his will Dowling left various legacies to all of his relatives and several friends including Pat S. Andres, his friend and secretary of many years and Austin Anderson, his longtime friend and associate in the practice of law. To Pat S. Andres he left a legacy of $15,000.00 and 2/14 of the residue of his estate. To Welborn he left a legacy of $5,000.00.
In addition, Dowling named Pat S. Andres as Executrix with full seizin and without bond and a fee of 2/12% of the estate for her service. He named Austin Anderson as the attorney for the estate with a fee of 5% of the estate for his service.
In addition to Dowling, the will was signed by Martin Kranz, Notary Public, and two witnesses, Ann Grosch and Helen Shade. *848 The will is dated March 16, 1985. Dowling died some nine months later on December 26, 1985. He was ninety-three years old.
Throughout 1985, both before and after the execution of the will, Dowling had been hospitalized for various illnesses and conditions associated with aging. These included congestive heart failure, pneumonia, heart rhythm disturbance, aortic sclerosis and aortic insufficiency.
On January 9, 1986, Austin Anderson, an attorney for the succession, probated Dowling's will. The trial court issued letters testamentary to Pat S. Andres as Executrix. Receiving no opposition or complaint from any of the relatives, Andres proceeded with the administration of the succession and delivered the legacies to the particular legatees, including Welborn, who accepted her legacy.
On January 8, 1991, one day prior to the running of prescription, Welborn filed suit opposing the will. In her petition to annul the testament, Welborn alleged lack of capacity and undue influence. She also alleged that Dowling did not sign the will in the presence of the notary and two witnesses nor did the notary and two witnesses sign the attestation clause in Dowlings' presence as required by Louisiana Revised Statute 9:2442.
Trial was held on May 10th and 11th, 1993. On May 18, 1993, the trial court granted judgment in favor of defendants, Pat Andres, individually and as Testamentary Executrix of the Succession of Richard A. Dowling, Austin Anderson, Mrs. Audrey L. Lind and Mrs. Kathleen A. Dowling Hite, and against plaintiff, Marion Welborn, dismissing her suit.
Welborn appeals the judgment of the trial court asserting the following assignments of error:
1). The trial court erred in finding that Austin Anderson and Pat Andres did not exert undue influence;
2). The trial court erred in finding that Dowling possessed the requisite testamentary capacity to execute a will on March 16, 1985;
3). The trial court erred by allowing into evidence a copy of a letter written by Welborn to Dowling dated December 12, 1984;
4). The trial court erred by not believing the testimony of Arietta Kirkland.

TESTIMONY ADDUCED AT TRIAL:

MARION DOWLING WELBORN WEINSTOCK:
Plaintiff, Marion Dowling Welborn Weinstock, testified that she last saw her uncle, Richard A. Dowling, in the fall of 1984. At that time she drove Dowling to visit an elderly aunt who was residing at the Chateau de Notre Dame retirement and nursing home. During a conversation on that occasion she stated she got the impression that Dowling was not lucid because he did not know how much he owned or how much money he had. She stated that she had no idea what his assets were at that time.

PAT ANDRES:
Pat Andres testified that she was a friend and secretary of Dowling since 1956. She was also a friend of Mrs. Dowling. She stated that she was still Dowling's secretary at the time he executed the will. She also was a secretary to Dowling's associate, Austin Anderson. She stated she did not know if Dowling and Anderson were partners.
Andres testified that after Dowling's wife died, she drove Dowling to wherever he wanted or needed to go. She admitted that she brought him to the hospital several times but denied signing her name as his nearest relative or spouse.
She stated from February, 1985 until his death, he had sitters around the clock.
Andres testified that Dowling ran and directed his own affairs and that she did whatever he requested her to do. It was Dowling who insisted on having sitters to help him and asked her to hire them even suggesting the Lippe Agency. Andres stated she suggested that he use a walker, not because she didn't want him to spend money, but so he wouldn't need to depend on someone else to walk. In addition to hiring the sitter, Andres stated she shopped for food, cooked and paid the bills using a joint "or" account which he opened for that purpose. She admitted *849 eating supper with Dowling every night. She often brought and prepared the food. He requested that she dine with him after his wife died because he hated to eat alone. She denied ever telling Dowling that he didn't have sufficient funds. She also denied instructing the sitters to screen the phone calls of certain relatives whose names were on a list or that such a list ever existed.
Andres testified that sometime in February, 1985, Dowling came to the office. He and Anderson talked in Anderson's office. Dowling then gave her the will and told her to type it in the proper form. The will was kept at the office until she brought it to his home on March 16, 1985 to he signed. Present at the home when she arrived at 7:00 a.m. was Dowling and his sitter, Arietta Kirkland. Andres testified she stayed in the house until the notary and witnesses arrived. She then went into the carport and waited in her car. She went back inside about thirty minutes later when the notary left. Andres stated that Dowling initially kept the will at his home but later told her to take it back to the office.
Andres denied firing Kirkland. She testified that Kirkland quit to take a job as a truck driver.
She testified that Dowling put her name on two transactions of sales of property in his wife's succession. No money changed hands. She signed the documents because he asked her to sign. She stated she did not know the reason.
Andres stated she did ask Kirkland to leave the house the day the will was signed so that Dowling could conduct his private business. As far as she knew Kirkland left the house. She testified that Dowling did receive a letter from Welborn dated December 12, 1984. She stated that after he read the letter he called her over and said "get a load of this." Then he told her to put the letter in the file. She stated she found a photo copy of the letter after Dowling died. She did not know what happened to the original.
She testified that Joyce Davis was the last maid who worked for Dowling. She quit in the early part of 1985.

AUSTIN ANDERSON:
Austin Anderson testified that he knew Dowling since 1930. They were not partners but were associated together in the practice of law since 1958. They shared office expenses but not profits.
He testified that Dowling came to him and asked him to assist in the preparation of his will. Dowling gave him some papers upon which he wrote an outline of the will. The contents of the outline were then prepared in proper form without changes, modifications, additions and exclusions. He stated he never questioned Dowling about the legacies and was not present in the home the day the will was signed.

ARIETTA KIRKLAND:[1]
Arietta Kirkland testified that she was employed by the Lippe Nursing Service as a sitter for two years. She began work at the Dowling residence on March 6, 1985. On March 16, 1985 she stated she worked from 7:00 a.m. to 11:00 p.m.[2]
She described Dowling as very weak when she first arrived. She had to assist him in walking, bathing and with bathroom functions. She massaged his legs and arms and gradually he was able to walk without help.
She stated a lady named Pat ran his household. She described Pat as rude and harsh with Dowling. She stated Pat often hit and slapped Dowling in his face and shoulder especially if he wouldn't eat the food she prepared which Kirkland described as not fit to feed to a pig. Once she said she made him some oyster stew and Pat "chewed" her out telling her he didn't have any money for oyster stew. She stated Pat often told him he didn't have any money. She testified that as long as he did what Pat told him to do Pat was nice to him. She *850 stated that it was obvious that Pat did not want Dowling to live because she wouldn't take him to the doctor.
She described a list of names of relatives that Pat placed by the telephone. Mrs. Welborn's name was on the list. She testified that Pat told her not to allow the people on the list to speak to Dowling.
She described herself as "scared to death" of Pat and that is why she refused to come to New Orleans to testify. She also described Dowling as afraid of Pat and said he would "shun" her.
She described an incident of extortion related to her by a young black maid in which the black maid threatened to reveal Pat's harsh treatment of Dowling unless Pat gave her $5,000.00 and gave her mother $10,000.00.
She testified that on March 16, 1985, between the hours of 7:00 a.m. and 11:00 p.m. no one was in the home but Pat and Dowling. She stated that Pat told her to go to the back of the house. Then Pat took Dowling into Dowling's room. Rather than leave, Kirkland stated she walked up the hall and hid from sight. She then heard Pat order Dowling to sign the will. Dowling objected saying he already had a will. Pat then told him the first will was lost and this was a copy of the first one. He complained he was tired and wanted to sit down. Pat refused to let him sit down until he signed the will.
Kirkland admitted she did not see the document Dowling purportedly signed and didn't see if he signed it. She stated that three to four days later she was fired because she was getting Dowling back on his feet and Pat did not want him to get well.
On cross examination Kirkland's testimony became confusing at best. She testified that the incident with the will occurred the same day she was fired which contradicted her prior testimony. Then she changed her mind and said she forgot what she was saying. She was also confused about the time of day the incident occurred. At first she said it happened after dinner then changed and said it was around noon, then changed again and said it happened in the evening.
Kirkland testified that Welborn telephoned her six to seven years ago while she was living in Georgia and told her she needed her to testify against Pat. Kirkland agreed to testify but refused to come to New Orleans. She stated that she spoke to Welborn four or five times after the initial contact. She admitted coming to New Orleans once per month to visit a friend but said she had no contact with Welborn in person but did call her from Georgia.
Kirkland admitted she told Welborn that Pat and Austin Anderson murdered Dowling. She stated that Pat brought bad food to Dowling and that the "black girl" told her that Pat and Anderson were in "cahoots" to get Dowling's money.
She also said that Dowling's wife often came to the office and Pat would give her coffee and then Mrs. Dowling died and the "black girl" believed Pat "had a hand in it."
Kirkland's testimony regarding the list of relatives who were not to speak to Dowling was equally confusing. She stated she never looked at the list because no one ever called and she didn't know if Welborn's name was on the list. This testimony contradicted her prior testimony. Then she testified that Welborn called all the time for Dowling as well as lots of other relatives but they were not allowed to speak to him. Then she admitted it was the "black girl" who told her Welborn called a lot. She also admitted that a lot of her testimony was based on what the "black girl" told her. Kirkland admitted that neither Pat nor Austin Anderson ever threatened her.

MARTIN KRANZ:[3]
Martin Kranz testified that he was the notary public in whose presence Dowling executed his last will and testament dated March 16, 1985. He stated he had been a friend of Dowling since 1918 when Dowling taught him at Loyola University. Dowling signed the will in his presence and in the presence of the two witnesses and he and the witnesses signed in Dowling's presence. Prior to signing the will, Kranz stated he read the will out loud to Dowling and the witnesses *851 and asked if everyone understood the contents. All indicated they understood. He described Dowling as mentally competent and "in possession of all of his faculties." He stated that no one else was present in the house when the will was signed. Neither Pat nor Austin Anderson were present. He said he did not see a sitter or maid.
On cross examination, Kranz vehemently denied that he was given the will to notarize after it had been signed. He testified that either Dowling or Anderson telephoned him about notarizing the will. He couldn't remember which man called. When he arrived at Dowling's home on March 16, 1985, Anderson met him at the door. However, when the will was signed neither Anderson nor Pat were present. He stated Dowling did not appear ill and did not appear to have lost much weight. He did not know if Dowling had a prior will and never discussed Dowling's financial affairs.

ANN GROSCH:
Ann Grosch testified she and her late husband were longtime friends of Dowling. She stated that after the death of her husband, Dowling acted as her attorney and guardian.
She stated that Pat Andres telephoned her and told her Dowling wanted to speak to her. Dowling then requested that she witness his will.
On March 16, 1985 when she arrived at Dowling's home, between 10:00 and 10:30 a.m., Pat met her at the door. When the notary arrived, Pat left.
Grosch testified that she saw nothing in Dowling's behavior that indicated he was mentally or physically impaired. He appeared to be "very normal." He greeted her and her sister. He put his arm around her and was "kidding" with both of them. He did not appear ill. He was dressed in a shirt, trousers and shoes. She estimated his weight between 168 and 170 pounds. They had a brief conversation about the television program he was watching, politics and his lovely patio in which he said his wife took great pride. He also kidded Kranz about his cowboy hat. They then sat around a table and Kranz began to read the will. As he read it he would stop and ask Dowling if this or that was what he wanted. Dowling answered "yes, go ahead, go ahead." Everyone indicated they understood. Each then signed in the appropriate place in the presence of each other. She stated she did not sign the first page because Dowling told her it was not necessary. Present at the signing were Dowling, herself, her sister, Helen Shade and Martin Kranz. No one else was present. After the signing of the will, Dowling asked them if they wanted cake and coffee. After a brief stay he saw them to the door and told them goodbye. She did not remember if Pat was in the home when they left.

HELEN B. SHADE:[4]
Helen Shade testified that she was acquainted with Dowling through her sister, Ann Grosch. She was acquainted with Pat and Austin Anderson from visits to Dowling's office.
On March 16, 1985 she accompanied her sister to Dowling's home to witness his will. Dowling was alert and talked about politics and "what not." When the notary arrived they all went into a dining area where they sat around a table. Mr. Kranz then began to read the will. Kranz asked Dowling if he understood the will. Dowling answered that he did. Shade testified that Pat left "about immediately" after she and her sister arrived. No one else was present but those who signed the will. She did not see a maid or a sitter. She testified that Dowling looked "terrific" "wonderful" and spoke "beautifully." She thought he was wearing a suit but couldn't remember if he took the jacket off or if he was wearing a tie. Dowling conversed with everyone about various subjects. He also spoke of his wife's lovely garden and how they fixed the garden.
She felt that Dowling understood everything in the will because he asked Kranz questions but never objected to anything in the will. After the will was signed, Dowling offered them some cake. Later he walked them to the door and said good bye.

*852 DRS. JESSIE P. PENICO AND CARL J. GULOTTA

Dr. Jesse P. Penico, an internist with a specialty in infectious disease stated he last treated Dowling from February 11, to the 22, 1985 when Dowling was hospitalized. Dr. Penico testified that Dowling was suffering from complications of aging including aortic insufficiency, intermittent atrial dysrhythmia, congestive heart failure, dilated cardiomyopothy and arthrosclerosis. He also suffered with bilateral cataracts. Despite his physical failings, Dr. Penico described Dowling as "remarkably well for his age". He was able to see and read. During most of his stay in the hospital Dowling was alert, oriented and spoke about "this, that and the other." Dr. Penico stated that Dowling was of sufficient mental capacity to draft a will.
Dr. Gulotta, a specialist in internal medicine, testified he treated Dowling in February and March, 1985. He described Dowling as lucid, bright and intelligent. He felt there was no reason why Dowling would not be able to execute a will.

AUDREY LANGLOIS LIND:
Audrey Langlois Lind, Dowling's niece and legatee, testified that she visited her uncle at least once per week during 1985. Their visit lasted between one and two hours and were usually in the afternoon. He liked to go outside and sit and chat. His conversations centered around his favorite television programs, the Pope and family history. Pat came everyday usually around 4:00 p.m.. Mrs. Lind stated she never saw her uncle incapacitated or mentally incompetent and felt he was capable of making a will.

DOROTHY D. WOLBRETTE:
Dorothy D. Wolbrette, Dowling's niece and legatee, testified that she visited her uncle approximately twice per month in 1985. Their visits lasted approximately two hours usually in the afternoon. She visited him more in 1985 than previously because in 1985 he was house bound.
She stated Dowling was always dressed in a shirt, tie, trousers, shoes and socks. Usually he was sitting in the den or breakfast room. He walked without help. He liked to chat especially about old family history, politics and some of his old cases. Afterwards, he sat outside where he fed pecans to a favorite squirrel. At times Wolbrette stated she saw her uncle with a sitter and sometimes with other visitors. She visited him in the hospital in February, 1985. He was ill but his conversations were normal. She testified that she believed Dowling was perfectly capable of making a will. She stated she never saw Pat exert any undue influence on her uncle. She testified she saw him as late as two days prior to his death and this was the only time she saw him when he was really weak.

RICHARD LANDRY:
Richard Landry, Dowling's friend of twenty years and legatee, testified that he visited Dowling at least once per week in 1985. Dowling was always dressed in a shirt and trousers. They walked, took rides in Landry's automobile and spoke of old times, current affairs and sports. Landry described Dowling as very active. He stated the sitters were there to prepare meals and see that Dowling took his medication. He testified Dowling "had a perfect mind." He stated Pat brought Dowling wherever he wanted to go, brought him food and administered his medication. He described Pat's behavior toward Dowling as "kind" and "considerate."

DARLENE WHITNEY:
Darlene Whitney, Dowling's neighbor, testified that she frequently saw Dowling in 1985 walking and sitting outside. They often spoke of the neighborhood, mutual acquaintances and other general topics of conversation. He was always neatly dressed in a shirt and pants, clean shaven and mentally alert. She testified that in February, 1985, she received a phone call from Welborn inquiring about Dowling's condition after he left the hospital. Welborn also inquired if Dowling had ever said anything against her. Whitney testified that she told Welborn that Dowling was recuperating and appeared fine and that she never heard him say anything against Welborn.

MAC AND RELLA RACKMEL:
Mac and Rella Rackmel, Dowling's neighbors and friends, testified as to Dowling's mental and physical condition.
*853 Mac Rackmel stated he was a fellow Shriner with Dowling for forty years. During 1985 he saw Dowling once or twice per week walking outside. They spoke mostly about Shriner business and things in general. He testified that up until the day of his death, Dowling's mental condition was "as good as it was when he was District Attorney." He described Dowling as having all his faculties. When he saw Dowling walking, he was usually assisted by either Pat or a sitter.
Rella Rackmel testified she visited Dowling often in 1985. After he was discharged from the hospital in February, 1985, Dowling appeared normal. Sometimes she visited him in his home, sometimes she saw him when he was walking or sitting outside. When he walked outside sometimes he was alone and sometimes he was with Pat. She stated Pat brought him something to eat everyday. In her opinion Dowling was mentally competent.

JOHN M. WHITNEY, JR.:
John M. Whitney, Jr., Dowling's neighbor testified that he often saw Dowling in his garden. They spoke of things in general. He stated Dowling was able to walk and was always dressed. He was aware Dowling had sitters around the clock. Pat often walked Dowling around the neighborhood. Pat was at Dowling's house everyday. It was Whitney's impression that Pat watched over Dowling and took care of him. Whitney believed Dowling was mentally competent. March 16, 1985, the day Dowling executed the will, was also Whitney's birthday. Whitney spoke to Dowling that day and described Dowling as "articulate as you are today."

MONA M. CAREY
Mona M. Carey, Dowling's friend and legatee, testified she knew Dowling since her childhood. He was her family's landlord. She visited the Dowlings throughout her life and continued to visit Mr. Dowling after his wife died. In 1985, Dowling was active. He was able to walk and read. His demeanor was very pleasant. She visited him on Easter Sunday, 1985. Pat Andres and Pat's sister were also at Dowling's home. On that day, Mrs. Welborn briefly stopped in to inquire about Dowling. Welborn was driving her daughter to a class. Dowling's mental condition was good. He was able to stand and walked with some guidance.

JOYCE DAVIS:
Joyce Davis testified that her mother, Hazel Edison was Dowling's maid for many years. After her mother quit, she became Dowling's maid. She worked in that capacity until one or two years before Dowling passed away. She stated that sometimes Dowling paid her and sometimes Pat paid her. However, all her checks were signed by Dowling.

ASSIGNMENTS OF ERROR 1 AND 2:
Marion Welborn asserts that the trial court erred as a matter of law in finding that Pat Andres and Austin Anderson did not exert undue influence on Richard Dowling and that Richard Dowling had the testamentary capacity to execute a will on March 16, 1985.
In his reasons for judgment, the trial court stated:
There was no evidence presented that would establish that Richard A. Dowling was mentally incapable of making a will on March 16, 1985, and there was not one iota of evidence that any undue influence, fraud or duress was ever used by anyone in the preparation and execution of decedent's will.
* * * * * *
Plaintiff's case falls far short of clear and convincing evidence of the invalidity of the testator's will. To the contrary, the evidence established that the last will and testament of Richard A. Dowling, dated March 16, 1985, is valid in every respect."

UNDUE INFLUENCE:
Welborn initially argues that the trial court incorrectly required proof by clear and convincing evidence rather than a preponderance of evidence as required by Civil Code Article 1483. That article provides that to nullify a donation inter vivos or mortis causa because of undue influence the proof must be by clear and convincing evidence unless, at the time of the disposition, a confidential relationship existed between the donor and *854 wrongdoer, then the burden is by a preponderance of the evidence[5].
Appellees argue that article 1483, adopted in 1991, should not be applied retroactively because it is the product of earlier legislation which repealed former Civil Code article 1492.
Our initial task is to resolve this issue. In order to do so it is necessary to briefly review prior jurisprudence with respect to allegations of undue influence.
Civil Code article 1479, adopted by Act 363 of 1991, provides that a donation inter vivos or mortis causa shall be null upon proof that it is the "product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor." The provisions of this article are new and are intended to fill the void and uncertainty created with the legislative repeal of former Civil Code article 1492. Comment, La.C.C. art. 1479. Prior to the passage of article 1479, article 1492 was controlling with respect to allegations of undue influence. That article (1492) provided: "Proof is not admitted of the dispositions having been made through hatred, anger, suggestion or caption."
Two jurisprudential rules evolved which limited the prohibitions of article 1492. In Cormier v. Myers, 223 La. 259, 65 So.2d 345, 349 (1953) the Court stated:
"While our law (Article 1492,[LSA-] C.C.) does not recognize duress, force or undue influence unless they are present at the making of the will, yet such incidents are evidence of the testamentary incapacity and mental weakness of the testatrix."
This often cited quote has led to a split in its interpretation. In Succession of Andrews, 153 So.2d 470 (La.App. 4th Cir.1963), this court recognized that undue influence is not grounds for invalidating a will, but evidence of it was admissable to show testamentary incapacity. That same interpretation was espoused by the Third Circuit in Guidry v. Hardy, 254 So.2d 675 (La.App. 3rd Cir.1971), writs refused, 256 So.2d 441 (La.1972). In that case the court concluded that undue influence was not a ground for invalidating a will in Louisiana even though California recognized it. The court stated:
"Evidence of force, duress or undue influence may be admitted in attacks upon the validity of wills, but that evidence should be considered only insofar as it tends to show lack of testamentary capacity." Id. at 681.
See, also Gibson v. Succession of Gumbel, 333 So.2d 340 (La.App. 4th Cir.), writ denied, 338 So.2d 111 (La.1976) wherein we again stated that undue influence is not a basis for invalidating a will.
Despite the fact that Article 1492 appeared in Chapter 2 of Title II of the Civil Code entitled "OF THE CAPACITY NECESSARY FOR DISPOSING AND RECEIVING BY DONATION INTER VIVOS OR MORTIS CAUSA" our brethren of the Second Circuit recognized a somewhat different interpretation. In Succession of Hamiter, 519 So.2d 341, 344 (La.App. 2nd Cir.), writ denied, 521 So.2d 1170 (La.1988) the court, citing Cormier, held:
"Duress, force or undue influence are not grounds for declaring a will void unless they are present at the making of the will; however, evidence thereof is nevertheless admissible to show testamentary incapacity or mental weakness."
Thus the Hamiter court, at least implicitly, recognized that undue influence occurring at the time of making a donation was grounds for nullifying the disposition. The conclusion which permits evidence of undue influence to show testamentary incapacity is consistent with former Article 1492's location in that section of the Civil Code dealing with donative capacity. The conclusion that undue influence at the time of a disposition is a separate basis for nullifying the disposition is inconsistent with the civilian method of code interpretation. Nevertheless, this additional interpretation has support in some of the jurisprudence prior to Cormier. See, Texada *855 v. Spence, 166 La. 1020, 118 So. 120 (1928), where the court, in dicta stated that undue influence, fraud or duress at the "moment the will was executed" would nullify the disposition.
Thus when Article 1492 was repealed by Act 788 of 1989 and later, Act 147 of 1990 it was well established that evidence of undue influence was admissible to prove testamentary incapacity, and at least some jurisprudence recognized it as grounds for nullifying a disposition if the influence occurred at the moment of making the disposition.
Considering this background, we conclude that the addition of Civil Code article 1479 in 1991 created a new cause of action for nullifying an inter vivos or testamentary disposition. By adopting that article the legislature has specifically recognized the cause of undue influence, in addition to incapacity, as a separate basis for nullifying a testamentary disposition. This is a substantive change in our law and should not be applied retroactively. La.C.C. Art. 6. While we recognize that Article 1483 is procedural in nature, it does not exist in a vacuum. Since it provides for the burden of proof necessary to satisfy the undue influence cause of action created by article 1479, it is not applicable since article 1479 is not applicable.
We therefore hold that the law as it existed at the time the testator's will was confected (March 16, 1985) applies in this case, and that evidence of undue influence is admissible only to prove testamentary incapacity. Undue influence cannot be used as a basis for nullifying the testament unless it can be shown that it occurred at the time the will was confected.[6]
All the witnesses to the will testified that neither Pat Andres nor Austin Anderson were present at the signing of the will. They could not have exerted any fraud, duress or undue influence at the time of the making. The trial judge totally discredited Kirkland's testimony and, after reviewing it, we find no error in that credibility call.
Even assuming arguendo that Article 1483 would apply, the record clearly shows Welborn failed to prove that Pat Andres and Austin Anderson exerted any undue influence, fraud or duress upon Richard Dowling. There is simply no evidence to this effect. The testimony of all the witnesses, with the exception of Arietta Kirkland, is to the contrary.

TESTAMENTARY CAPACITY:
In Succession of Lyons, 452 So.2d 1161 (La.1984), our Supreme Court set the standard that there is a presumption in favor of testamentary capacity and that the party alleging lack of testamentary capacity must overcome that presumption by clear and convincing evidence. The clear and convincing evidence rule was subsequently codified by Acts 363 of 1991 which amended Civil Code Article 1482 to provide:
"A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor made the donation inter vivos or executed the testament ..."
Proof by "clear and convincing" evidence requires more than a "preponderance of the evidence", the traditional measure of persuasion, but less than "beyond a reasonable doubt", the stringent criminal standard. Succession of Bartie, 472 So.2d 578 (La. 1985); Succession of Lyons, supra. To prove a matter by "clear and convincing" evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Louisiana State Bar Association v. Edwins, 329 So.2d 437 (La.1976).
In determining testamentary capacity the question is whether the testator understood the nature of the testamentary act and appreciated its effects. Succession of Lyons, supra. The determination of testamentary capacity is a question of fact upon *856 which the trial judge's findings will not be disturbed unless manifestly erroneous. Succession of Dorand, 596 So.2d 411 (La.App. 4th Cir.), writ den. 600 So.2d 661 (La.1992).
Applying the above rules of law, we find Welborn failed to rebut by clear and convincing evidence the presumption that Richard Dowling possessed testamentary capacity when he executed the will of March 16, 1985.
All the witnesses to the will testified that Dowling was alert, articulate and physically able to execute the will on March 16, 1985. Dowling's treating physicians as well as Dowling's friends, relatives and neighbors who observed and spoke to him during the weeks and months before, during and after the will was signed, all testified he was mentally alert and physically active and capable of making a will.
Welborn also complains that the trial court erred in not finding that Austin Anderson violated Louisiana Model Rule 1.8(c) which replaced former Code of Professional Responsibility 5-5, on January 1, 1987. Rule 1.8(c) did not change the law. It provides:
"A lawyer shall not prepare an instrument giving the lawyer or a person related to the lawyer as parent, child, sibling, or spouse any substantial gift from a client, including a testamentary gift, except where the client is related to the donee."
The evidence clearly shows that Austin Anderson was not Dowling's attorney and had no input in the preparation of the substance of Dowling's will. Anderson merely assisted Dowling in putting the will in the proper statutory form. Anderson did not violate any professional rules of conduct.
These assignments of error are without merit.

ASSIGNMENT OF ERROR 3:
Welborn asserts that the trial court erred in allowing into evidence a copy of a letter from Welborn to Dowling dated December 12, 1984. Welborn argues the letter is irrelevant hearsay and was used to convince the trial court that this was the reason Dowling only left $5,000.00 to Welborn.
We agree with plaintiff that the letter is irrelevant hearsay. C.E. Arts. 401 and 801. However, in the absence of forced heirs the testator was free to leave his property to whomever he wished. No reason need be given by him or the court. The trial court's statement as to why Dowling bequeathed "only $5,000.00" to Welborn is superfluous.
This assignment of error is without merit.

ASSIGNMENT OF ERROR 4:
Welborn asserts the trial court erred in not believing the testimony of Arietta Kirkland. In his reasons for judgment, the court characterized Kirkland's testimony as "replete with inconsistencies and not worthy of belief." It is a well established rule of law that the credibility of witnesses is for the trier of fact to determine. The "manifest error-clearly wrong" standard demands great deference to the trier of fact's findings.
We agree with the trial court's assessment of Kirkland's testimony. It is replete with inconsistencies and not worthy of belief. Kirkland worked for Dowling from March 6 to March 19, 1985. In less than two weeks she supposedly observed harsh and abusive treatment that friends and relatives of both Dowling and defendants had not witnessed in years of association. In addition, Kirkland admitted that much of her testimony was based on what "the black girl" told her. That person was never identified and no one fitting her description testified at the trial. Kirkland's version of how Dowling signed the will is simply incredible, as well as her unfounded accusations of foul play.
This assignment of error is without merit.
For the reasons assigned above, the judgment of the trial court is affirmed. All costs of this appeal to be paid by appellant.
AFFIRMED.
NOTES
[1] Arietta Kirkland testified via video deposition of February 3, 1992 taken in Hephzibah, Georgia.
[2] Annie Ruth Lippe, owner of Lippe Nursing Register testified Arietta Kirkland worked at the Dowling residence on March 16th, 17th and 18th, 1985.
[3] Martin Kranz testified via deposition of January 10, 1992.
[4] Helen Shade testified via deposition of July 16, 1991.
[5] However, if the wrongdoer who is in a confidential relationship with the donor is related by affinity, consanguinity or adoption, then the burden of proof is still by clear and convincing evidence.
[6] Our holding that Articles 1479 and 1483 are not to be applied retroactively is consistent with the legislation which repealed former Civil Code Article 1492. For example. Section (4) of Act 788 of 1989 provided that its provisions "shall not apply to confirm, ratify, validate or invalidate any provision of any testament executed prior to July 1, 1990, regardless of the date of the testator's death." Similar provisions were included in Act 147 of 1990 which replaced Act 788. See, La.R.S. 9:2501.