JjLANDRIEU, Judge.
Edward A. Horrell, Sr. died July 9, 1993, at age 84, leaving his wife of more than fifty years, Clare Younger Horrell (Mrs. Horrell), and five adult children, Walter (bom in 1939), Gaye[1] (bom 1940), Michael (born 1942), Edward, Jr. (bom in 1946), and Marie Elise a/k/a “Liz” (bom in 1948). Shortly after his death, Mrs. Horrell filed a petition and order for appointment of administratrix with a sworn descriptive list, stating that Mr. Hor-rell died intestate.
The detailed descriptive list indicates that at the time of his death Mr. Horrell owned the following separate immoveable property: The family home at 505 Florida Avenue (valued at $125,000) and industrial property at 2020 Lafayette Street (valued at $150,000), both in New Orleans, as well as an entire city block[2] located at 19th and Tyler Streets in downtown Covington (valued at $300,000).
Mr. Horrell owned, as community property with his wife, a camp located in Lake Catherine, Louisiana (valued at $50,000), and the industrial property at 124821 Earhart Boulevard in New Orleans where his company (Horrell and Company, Inc.) business office and warehouse were located (valued at $200,-000). In addition, Mr. and Mrs. Horrell owned as joint tenants with a right of surviv-orship a house in Bay St. Louis, Mississippi *726 (valued at $125,000) and two lots in Diamond-head, Mississippi (valued at $24,000).
Several days prior to the filing of Mrs. Horrell’s petition and descriptive list, however, the Horrell’s oldest son, Walter, sought to have his father’s statutory will (executed on April 13, 1993) probated. It provided the following:
I, Edward A. Horrell, make this my last will and testament. I hereby revoke any prior wills or codicils that I may have made.
I give, grant, donate and bequeath the usufruct of all shares that I own in companies listed on the New York Stock Exchange and the usufruct of my home located at 505 Florida Boulevard, New Orleans, Louisiana, to my spouse, Clare Younger Horrell, for the rest of her life.
Subject to the usufruct of the premises at 505 Florida Boulevard, New Orleans, Louisiana, granted to my spouse, I give, grant, donate and bequeath all the immovable property (real estate) that I own in the Parish of Orleans, State of Louisiana, to four of my five children, namely Marie Elise Horrell, wife of Paul LeCour, Edward A. Horrell, Jr., Michael J. Horrell, and Gay Ann Horrell, divorced wife of John B. Coffer.
I give, grant, and bequeath all the immovable property (real estate) that I own in the Parish of St. Tammany, State of Louisiana, to my fifth child, Walter J. Hor-rell.
I give, grant, donate, and bequeath all the remainder of my property to my five children, Walter J. Horrell, Gay Ann Hor-rell, divorced wife of John B. Coffer, Michael J. Horrell, Edward A. Horrell, Jr., and Marie Elise Horrell, wife of Paul LeC-our. I make them my universal legatees.
I name and appoint Walter J. Horrell as executor of my succession with full seizin and without bond or security.
The will, which had been prepared by Walter’s daughter, Mary F. Horrell, a notary public, was signed in Mr. Horrell’s hospital room at Mercy Hospital and witnessed by Edna a/k/a “Betty” Horrell (Walter’s wife) and Allen E. Horrell (Walter’s son) with Walter present. On the same day that Mr. Horrell signed thejjwill, he also signed an Act of Donation prepared by Walter (who was an attorney) giving Walter the property in Covington.[3]
On July 23, 1993, Mrs. Horrell was appointed administratrix. On August 31, 1993, she and four of her children (Gaye, Michael, Edward, and Marie Elise) petitioned to have the will declared invalid, alleging lack of testamentary capacity, undue influence, lack of sufficient number of witnesses, and conflict of interest. The two proceedings (the intestate succession filed by Mrs. Horrell and the testate succession filed by Walter) were consolidated on December 22,1993.
On Jan. 10,1994, Walter sought to remove his mother as administratrix and to have all the succession property delivered to him as executor. He alleged that his mother (1) failed to include two vehicles (a 1980 truck and a car) in the descriptive list; (2) used only rough estimates in valuing the succession property; (3) commingled funds and continued to write cheeks for her own purposes; (4) paid succession debts without authorization of the court; (5) had taken steps to continue the business without complying with codal requirements and failed to operate it for the benefit of the succession. The trial court granted Walter’s motion, removing Mrs. Horrell as administratrix and ordering her to deliver all succession property to Walter.
On March 23,1994, an accountant completed a list of deposits and disbursements in the Horrells’ four bank accounts. In April, Walter filed a rule for contempt because his mother had failed to deliver the succession property to him. On April 7th, Mrs. Horrell petitioned for an interim allowance because Walter was receiving the stock dividends which Mr. Horrell had transferred to her prior to his death giving her an annual income of approximately $21,140 in |4monthIy payments of $700 and quarterly payments of *727 $3000. Walter opposed the petition, arguing that his mother received social security payments of $750 per month and that the house in Mississippi (where his sister Gaye lived) “should be producing income in the approximate amount of $600 per month.”[4]
On Sept. 28, 29, and October 3, 1994, a hearing was held on the petition to nullify the will and the rule to remove Walter as executor. On November 17, 1994, the trial court denied both, stating that Walter’s siblings failed to prove by clear and convincing evidence that Mr. Horrell lacked testamentary capacity when he executed the April 13th testament. The trial judge found that the testimony of Walter, his wife, and children as to what occurred on the evening of April 13 was consistent in all material respects and “made it clear that Mr. Horrell had total control and use of his faculties, that he was aware of his surroundings and that he knew exactly what he was doing.” The trial judge dismissed the testimony of Dr. Harvey Rif-kin, stating that his psychiatric examination of Mr. Horrell shortly after the will was executed was based on inadequate facts and contradicted by the testimony of Dr. Robert Jeanfreau, Mr. Horrell’s treating physician.
Appellants challenge that judgment, arguing that Mr. Horrell lacked capacity to execute the will or that the will was a product of fraud and/or undue influence exerted by Walter and his daughter Mary.

DISCUSSION

“To have capacity to make a donation inter vivos or mortis causa, a person must also be able to comprehend generally the nature and consequences of the disposition that he is making.” La. Civ.Code Ann. art. 1477 (West Supp.1996). In determining testamentary capacity the question is whether the testator 15understood the nature of the testamentary act and appreciated its effects. Succession of Dowling, 93-1902 (La.App. 4 Cir. 2/25/94), 633 So.2d 846, 855 (citation omitted). “As used in this Article the reference to the ‘nature’ of the disposition means that the donor must be capable of understanding that he is making a gratuitous transfer of property that he owns to someone else who will become the owner of it, without recompense_” La.Civ.Code Ann. art. 1477, comment (d). “A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor made the inter vivos donation or executed the testament ” La.Civ.Code Ann. art. 1482 (West Supp.1996).
The trial judge’s finding that Walter and his family were consistent in their testimony as to the events of the evening of April 13 is not dispositive as to the issue of whether Mr. Horrell understood the nature of the testamentary act or appreciated its effects. Clearly, Walter’s wife, Edna, and his children, Mary and Allen, who both lived on the Covington property rent-free[5] and who, in the natural course of events might stand to eventually inherit the property from their father have an interest in upholding the will.
Seven months prior to the testator’s death, he slipped and fell in a grocery store, fracturing his hip. He underwent surgery at Mercy Hospital in New Orleans in January 1993 to repair the fractured hip and was released in mid-February. In March, Mr. Horrell was readmitted for pressure sores on his heel. He remained in Mercy Hospital through May and it was during this second hospitalization that the disputed will was signed. Mr. Hor-rell then went to a nursing home in Mississippi for a short stay, was readmitted to Mercy Hospital for a short period |6and then sent to a long-term care facility. While there, he suffered respiratory arrest for which he returned to Mercy Hospital where he died. At the hearing, his treating physician and a psychiatrist testified as to Mr. Horrell’s mental status during his periods of hospitalization.
*728 Dr. Robert Jeanfreau, his treating physician, testified that he began treating Mr. Horrell shortly before the surgery and continued to treat him daily because of Mr. Horrell’s atrial fibrillation. He noted that during his first • hospitalization Mr. Horrell was physically debilitated and exhibited poor memory. At the time of his discharge, Mr. Horrell continued to exhibit poor memory. Upon readmittance to the hospital for heel sores, Mr. Horrell' appeared more debilitated, his overall nutritional status appeared worse, and he still had poor memory. Dr. Jean-freau stated that Mr. Horrell was frequently confused,[6] particularly during the second hospitalization, and that he often did not know where he was. When questioned as to whether Mr. Horrell was competent to execute a will during his second hospitalization, Dr. Jeanfreau asserted that he did not feel that Mr. Horrell was competent and that the confusion exhibited by Mr. Horrell interfered with his ability to fully understand and comprehend the implications of legal documents like the will and the Act of Donation which he executed. Dr. Jeanfreau testified that he did not remember if he had explicitly ordered the psychiatric consultation, but that he thought that it was appropriate in light of the execution of the will.
Dr. Harvey Rifkin, the psychiatrist who examined Mr. Horrell on April 27th, stated that Mr. Horrell was very disoriented, answering “January” in response to a question as to the date. Mr. Horrell became very agitated, refused |7to answer any further questions and told Dr. Rifkin to “get the hell out of my room.”
The doctors’ testimony as to Mr. Horrell’s mental status is corroborated by the testimony of Mr. Horrell’s son-in law, Paul LeCour. LeCour testified that when he visited Mr. Horrell during the week of April 5th he looked “glassy-eyed.” Further, Paul related an incident where his father-in-law asked him if he had brought a diesel engine starter for him which he had, in fact, worked on and returned 18 years before.
In addition, several provisions of the will itself are indicative of Mr. Horrell’s lack of comprehension as to the document and its consequences. He left the house in Mississippi, which he owned jointly with a right of survivorship with his wife, to four of his children subject to the usufruct of his wife. However, Mrs. Horrell became the sole owner of the house in Mississippi upon Mr. Hor-rell’s death. Accordingly, it was not within Mr. Horrell’s power to give that property to his children.
Furthermore, since the witnesses agree that the Act of Donation was signed first, Mr. Horrell no longer owned the Covington property at the time he signed the will and, thus, it was not within his power to give that property by will. Even if the Act of Donation was signed after the will and Mr. Horrell maintained ownership of the property at the time the will was signed, the fact that the two documents were signed at the same time indicate Mr. Horrell did not understand the nature or consequences of the documents.
In essence, by the terms of the purported will, one child received an unencumbered piece of property valued at $300,000, while his four siblings received shared ownership of property (subject to their mother’s usu-fruct) valued at approximately $375,000. There is no apparent reason why Mr. Horrell would so favor one child over the others, although it was suggested in oral argument that jgWalter was given the Covington property because he had always lived on it. We note that Mr. Horrell’s other children and wife were similarly situated (Gaye lived in her parents’ house in Mississippi, Michael[7] lived in his parents’ camp on Lake Catherine, Edward worked with his father in the business on Earhart Boulevard, and Mrs. Horrell had lived in the Florida Avenue residence for over fifty years), but inexplicably did not receive similar treatment.
*729 Moreover, the testimony of Elwin J. Bo-stwick (Mr. Horrell’s accountant since 1956 and a disinterested witness), refutes the suggestion that Mr. Horrell would favor one child to the detriment of the others. Mr. Bostwick testified that a few months prior to Mr. Horrell’s hospitalization, in the course of a conversation pertaining to the taxes and insurance which Mr. Horrell paid on the Covington property, he suggested “why don’t you just give the property to Walter?” Mr. Horrell replied “I can’t do that. I have other children I have to worry about.”[8]
.Based on the objective evidence, as well as the medical testimony, it is clear that Mr. Horrell lacked the requisite understanding of the nature of the testamentary act and its effects. Accordingly, we do not reach the issues of undue influence and fraud.
For the foregoing reasons, we find that the trial judge was manifestly erroneous in denying the petition to nullify the will. Accordingly, the judgment of the trial court is reversed. The Petition for Declaration of Invalidity of Alleged | ¡/Testament and the Motion to Remove Executor are granted, and the matter is remanded for further proceedings.
REVERSED.

. Throughout the record Ms. Horrell’s name is inconsistently spelled as Gay, Gaye, and Gayle.

. The record indicates that at least two houses were located on the property and there is some indication that it was subdivided into 10 lots.

. Six weeks later, after discovery of this Act of Donation filed in the St. Tammany public records, Mr. Horrell signed an Revocation of Donation prepared by an attorney hired by Mr. Hor-rell's other children.

. Nothing in the record indicates that Walter, who has lived rent-free on the Covington property his entire life and whose son likewise lives rent-free in a separate house on the property, began paying rent to the succession.

. Mary (who prepared the will giving the property to her father) lived rent-free with her parents while her brother (who had, along with his mother, witnessed the signing of the will which gave the property to his father) lived rent-free in a separate residence on the property.

. Dr. Jeanfreau noted that this frequently occurs when elderly people are put in the hospital, although they often return to their normal level of functioning when they return to their home environment.

. Michael Horrell, a ¿career merchant marine, keeps some of his belongings at his parents' home on Florida Avenue, as well as at the camp on Lake Catherine, and used his parents' car when he was in the country.

. In addition, Gaye Horrell Coffer testified that, when she questioned her father on April 23, 1993, as to whether he had given Walter the Covington property, her father told her "I only gave him an option to buy that property.” This is consistent with Mr. Bostwick’s testimony indicating that Mr. Horrell did not consider giving Walter the property to the detriment of his other children. In addition, Ms. Coffer testified that Mr. Horrell executed a handwritten note dated 4/29/93 stating that "The Masons have my will only at the consistory only” and that “as of this day, there is no will except with the consistory.”