ESTATE OF LARSEN: ROTHE, Administratrix, Appellant,
v. OLINGER, Respondent.

*April 9—May 5, 1959.*

For the appellant there was a brief and oral argument by *A. W. Ponath* of Appleton.

For the respondent there was a brief and oral argument by *Bernard F. Mathiowetz* of Milwaukee.

CURRIE, J.    The sole issue on this appeal is whether the determination of the trial court, to the effect that the transfer of the 223 shares of stock had not been secured through undue influence, is against the great weight and clear preponderance of the evidence.

For many years Martin Larsen had been engaged in operating a shoe-repair shop. The living quarters of himself

and his wife, Minnie, were located in the same building as such shop, which building was not owned by him but was leased from the owner. After Martin Larsen died the widow gave up the shoe-repair business but the landlord continued to charge the same $45 per month rental as before. Minnie thought some reduction should have been made by the landlord and refused to pay the rent. As a result the landlord caused her eviction in July, 1953. Thereafter, she resided in the home of her stepdaughter Isabel Olinger and the latter's husband until her death on February 11, 1958.

Until the latter part of 1956 Minnie paid the Olingers $10 per week for room and board upon the insistence of Mr. Olinger. On December 10, 1956, Minnie at the request of Mr. Olinger signed a written authorization whereby Isabel Olinger was authorized to withdraw from Minnie's bank savings account the sum of $100 per month for board, room, and care. By reason of such authorization Isabel Olinger did withdraw such $100 per month for such purpose. Thus the Olingers were paid for the room and board furnished to Minnie during the period from July, 1953, through February, 1958.

The testimony of the disinterested witnesses is all to the effect that she exhibited signs of senility during the last few years of her life. She seemed bewildered and confused. On at least two occasions she expressed the wish that she could talk with her deceased husband by telephone. Among such disinterested witnesses were two employees of the east side branch of the First Wisconsin National Bank where she did business, and one Calhoun, an officer of the Standard Savings & Loan Association, who, together with his father, had handled business matters for Minnie for many years.

On December 2, 1956, Minnie fell and fractured her left arm and was hospitalized in St. Michael's Hospital in Milwaukee from December 2, 1956, until December 15, 1956.

The hospital records disclose that at that time she was "confused and disoriented."

Next door to the Standard Savings & Loan Association office was a restaurant which Minnie sometimes frequented. Two of the employees of such restaurant also testified. Minnie on such visits to the restaurant was extremely poorly dressed and would sit at a table and weep. She would order only inexpensive items to eat and would complain about being poor. She would also beg food off from the plates of other patrons. She was also observed to put sugar in a glass of water and then dip a paper napkin in the solution and eat the dipped pieces of napkin.

Isabel Olinger testified that Minnie, while living at the Olingers, went out in the daytime and worked elsewhere as a domestic. However, Mrs. Olinger was unable to furnish the name of a single person who had so employed Minnie.

The testimony as to the circumstances of the transfer of the 223 shares of Wisconsin Electric Power Company preferred stock was given by Barbara Olinger who was the wife of James Olinger, an adult son of Isabel Olinger. Her testimony is as follows: Barbara and her husband lived in another part of the city from Isabel Olinger. Barbara came to the Isabel Olinger home after supper on Saturday evening, January 29, 1955. Minnie told Barbara that she wanted to give something to "Jim's mother" for all she had done for Minnie. Minnie then went upstairs to her bedroom and brought down six stock certificates covering the 223 shares of stock and asked Barbara to complete the assignment forms on the back. Isabel had a typewriter and Barbara used the same to type Isabel's name and address as assignee in the assignment forms on the back of the certificates. Then Minnie signed the assignments and Barbara witnessed the signature on each. Minnie then handed the certificates to Isabel. Isabel testified that in so doing Minnie said, "You can have these but not the checks," which was interpreted

by Isabel as a reservation by Minnie of the dividend checks during her lifetime.

Isabel admitted that her husband had previously talked to Minnie and had asked her to make the assignment. Isabel's husband also talked to Minnie and asked her to make a will to reward them for providing her with room and board. Mr. Olinger even went so far as to discuss the matter with an attorney. This attorney refused to draft the will unless Minnie would come to his office and give him the necessary directions for doing so. This Minnie apparently refused to do.

A few days before Minnie died she contracted influenza and was taken to a hospital. After she was taken to the hospital she suffered a stroke which caused her death. The period of hospitalization preceding death was less than a week. There is no testimony that Isabel Olinger and her husband ever provided Minnie with care during illness as apparently Minnie had been up and about until such attack of influenza.

Isabel Olinger notified none of Minnie's relatives prior to the funeral. By means of a power of attorney executed by Minnie, Isabel withdrew sufficient money from Minnie's savings account to pay the expenses of last illness and the funeral. Mary Nowak, Minnie's sister who resided in Florida, had visited Minnie each summer since Martin Larsen had died. After the funeral Isabel wrote a letter to Mary Nowak and told her of Minnie's death. In such letter Isabel stated that Minnie for years had filed no income-tax returns. She also stated that Minnie had left a small estate and that not much would be left after the government got its share and funeral expenses and doctor bills were paid. In such letter Isabel falsely stated that no provision had been made for paying Isabel for the four years that she had provided Minnie with a home. This letter apparently was written for the purpose of inducing Mary and the other rela-

tives to release their share of the estate to Isabel. Isabel and her husband also tried to induce the other heirs to consent to Isabel being appointed administratrix but they refused to so consent.

Having stated the factual background we will now examine the applicable principles of law. Many Wisconsin cases have held that, in order to establish a case for voiding a will because of undue influence, four elements must be proved. 16 Callaghan's Wis. Dig., Undue Influence, p. 804, sec. 1. In the case of *Will of Ehlke* (1943), 244 Wis. 115, 121, 11 N. W. (2d) 497, these four elements are stated to be:

"To make out a case of undue influence there must be shown (a) opportunity to exercise influence; (b) disposition to exercise influence; (c) susceptibility of the subject to influence by the person having the opportunity; and (d) a result indicating the exercise of undue influence by such person."

In general these same four elements are requisite in order to avoid on the ground of undue influence an *inter vivos* gift by deed or written assignment. In cases where a donor of modest means gives away a substantial part of his estate, the fourth element of successful result is established by the very fact that the donor executed the written transfer of gift.

This court has frequently commented upon the fact that in most cases proof of undue influence may, and usually does, rest solely upon circumstantial evidence. *Will of Ehlke, supra,* at page 121, and *Will of Leisch* (1936), 221 Wis. 641, 648, 267 N. W. 268. This is because the exercise of the undue influence is usually accomplished in secret. Concomitant with the rule, that circumstantial evidence is sufficient to prove undue influence, is the further rule that, where three of the elements required to show undue influence are clearly established, only slight additional evidence as to the fourth element is necessary to compel the inference

of its existence. *Will of Lee* (1946), 249 Wis. 59, 64, 23 N. W. (2d) 405; *Will of Stanley* (1937), 226 Wis. 354, 357, 276 N. W. 353; *Will of Walker* (1927), 193 Wis. 264, 271, 213 N. W. 626; and *Elliott v. Fisk* (1916), 162 Wis. 249, 253, 155 N. W. 110.

It is conceded that Isabel Olinger and her husband had ample opportunity to exercise undue influence upon Minnie Larsen inasmuch as they all resided together under the same roof.

There also was sufficient evidence to have sustained a finding of a disposition upon the part of the Olingers to exercise undue influence if the trial court had so found. Undue influence which will avoid an *inter vivos* transfer is such influence as is obtained by excessive importunity, superiority of will or mind, or by any other means constraining the grantor or assignor to do what he or she is unable to refuse. *Withers v. Withers* (1950), 363 Pa. 431, 70 Atl. (2d) 331, 333. Isabel Olinger admitted that her husband had talked to Minnie Larsen about assigning the stock over to Isabel. She then was asked why her husband had talked to Minnie about making such assignment and Isabel answered, *"Well, I don't know why he shouldn't. After all, he was taking care of the woman."* When Isabel was questioned about the motive which had prompted her husband to try and induce Minnie to make a will, she stated, *"Well, we were entitled to it. We were entitled to something."*

Repeated requests to Minnie to make the transfer of the stock, or to will her property to the Olingers, under the circumstances of this case may well have been sufficient to constitute undue influence. The exertion of such importunities upon an aged person in Minnie's position with no other place to go to live, who was obsessed with the idea that she was poor, may well have caused her to yield to such influence and make the assignment in order to secure peace and a sense of security.

On the issue of disposition to exercise undue influence, we also consider it material that Isabel Olinger after Minnie's death concealed from Minnie's relatives the fact that this $17,000 transfer had been made and that, exclusive of such transfer, Minnie had paid them for the board and room provided. Not only were such facts concealed, but the false statement was made, that the Olingers had received nothing for what they had done for Minnie, in an effort to induce Minnie's relatives to turn over their share of the remaining estate to Isabel.

It is wholly immaterial that undue influence may have been exerted by the husband of Isabel Olinger rather than by her. 43 C. J. S., Influence, pp. 378, 380. In an annotation appearing in 96 A. L. R. 613, entitled, "Undue influence by third person in which immediate beneficiary did not participate," the author of the annotation states:

"Therefore a gift, grant, or bequest procured by undue influence is vitiated thereby, and it is immaterial that in the procurement thereof the immediate beneficiary did not participate."

The causing of an aged person to transfer property that she may need for her future support in the event she should survive for many years and for the expenses of medical, hospital, and nursing care incidental to a prolonged illness, is sufficient proof of successful result. However, there are certain facts present which mitigate in Isabel Olinger's favor in considering the element of result. One is that the shares of Wisconsin Electric Power Company preferred stock assigned were originally owned by Martin and Minnie Larsen in joint tenancy, and Minnie acquired title to the whole as a result of survivorship. Therefore, if Minnie had continued to own the same until her death, Minnie's next of kin would have inherited the same to the exclusion of the two step-

daughters, Isabel and her sister. Minnie still retained other substantial assets, after the transfer, valued at approximately $22,000, which her own next of kin inherited. Another fact to be considered is that Minnie's own next of kin did nothing toward providing her with a home while Isabel and her husband did.

We now come to the crucial issue of this appeal, *i.e.,* whether Minnie Larsen was a person susceptible to undue influence. We have heretofore recounted the testimony of disinterested witnesses as to Minnie being senile during the last few years of her life. In addition, Dr. Elizabeth Henning, a qualified and experienced psychiatrist, was called as an expert witness for the administratrix. Dr. Henning testified, after hearing testimony by the other witnesses with respect to acts of Minnie observed by them, that such acts indicated failing judgment and a distortion or misrepresentation of reality. She further testified that a senile person, because of failure of judgment and misinterpretation of reality, might sign something which a normal person would not. This court in the recent case of *Estate of Brzowsky* (1954), 267 Wis. 510, 520a, 66 N. W. (2d) 145, 67 N. W. (2d) 384, held that evidence of impaired mental powers on the part of the person alleged to have been the victim of undue influence makes it easier to substantiate a charge of undue influence. In other words, it in itself is a circumstance which gives rise to the reasonable inference that such person was susceptible to undue influence.

Opposed to this testimony favorable to the administratrix is that of Barbara Olinger, Isabel's daughter-in-law. The learned trial court in its memorandum opinion placed great reliance upon Barbara's testimony. We quote from such memorandum opinion as follows:

"Barbara Olinger, a daughter-in-law of Isabel Olinger, testified that Minnie Larsen brought the certificates and

wanted them assigned to Jim's mother, Isabel Olinger, that Barbara typed the assignments and then Minnie Larsen handed the certificates to Isabel Olinger and said, 'You can have these but the checks,—I want the checks,' referring to the dividends.

"This would indicate that Mrs. Larsen knew what she was doing and was under no influence."

The credibility of Barbara's testimony was for the trial court, as the trier of the facts, to determine, and is not the province of this court. *Will of Kalskop* (1938), 229 Wis. 356, 364, 365, 281 N. W. 646, 282 N. W. 587, 119 A. L. R. 1094. The trial court in its discretion could have disbelieved such testimony and disregarded the same. *Estate of Bradbury* (1957), 275 Wis. 564, 568, 82 N. W. (2d) 804, and *Heuer v. Heuer*, ante, p. 208, 96 N. W. (2d) 485. This is because the testimony of the disinterested witnesses with respect to Minnie's senility rendered the same improbable. However, the trial court was not obliged so to do. Barbara's testimony gains some support from Dr. Henning's testimony with respect to the occurrence of lucid intervals on the part of people afflicted with senility. On cross-examination Dr. Henning stated that people suffering from senility may have such periods of lucid intervals although they occur less frequently and are of less duration as the senility progresses. There is, therefore, the possibility that the facts testified to by Barbara did occur during such a lucid interval.

While we would have had no difficulty in affirming a determination by the trial court that the transfer was made as the result of undue influence, we are not prepared to hold that the finding of the trial court, that Minnie was not susceptible to undue influence at the time she made the transfer, together with the ultimate finding that such transfer was not the result of undue influence, are against the great weight and clear preponderance of the evidence. A finding

of fact of a trial court made upon conflicting evidence should not be set aside on review if a judicial mind could, on due consideration of the evidence as a whole, reasonably have reached the conclusion of the court below. 3 Am. Jur., Appeal and Error, p. 461, sec. 896; and *Estate of Llewellyn* (1929), 296 Pa. 74, 77, 145 Atl. 810, 66 A. L. R. 222, 225. We deem that this is but another way of phrasing the great-weight-and-clear-preponderance-of-the-evidence test long employed by this court in passing on findings of fact of a trial court.

The brief of the administratrix cites the case of *Quinn v. Quinn* (1907), 130 Wis. 548, 110 N. W. 488, as authority in support of her contention that a fiduciary relationship existed between Minnie Larsen and Isabel Olinger, and because of such fiduciary relationship there was a presumption that the transfer was the result of undue influence. However, in the *Quinn Case* the aged grantor had intrusted the handling of his business affairs to his son, the grantee, and it is this fact which created the fiduciary relationship. In the instant case there is no evidence that at the time of the assignment of the 223 shares of stock a similar fiduciary relationship existed between Minnie Larsen and Isabel Olinger.

*By the Court.*—Judgment affirmed.