704 So.2d 252 (1997)
SUCCESSION OF Robert Roger REEVES, Jr.
No. 97-20.
Court of Appeal of Louisiana, Third Circuit.
October 29, 1997.
Rehearing Denied February 6, 1998.
*253 Lawrence Sandoz, Jr., Opelousas, for Jarrett Garney Reeves.
Sidney Milton Blitzer, Jr., Richard F. Zimmerman, Jr., Baton Rouge, for Robert Roger Reeves, Jr.
Harry James Lossin, Sr., Joneville, for Dorothy Ann Reeves Faillace.
Before DOUCET, C.J., and YELVERTON, SAUNDERS, WOODARD and AMY, JJ.
SAUNDERS, Judge.
Robert Roger Reeves, Jr., died in 1992, leaving a statutory will in which he left certain bequests to his second wife, Jarrett Ganey Reeves, with whom he had been married more than eleven years. This appeal arises from the allegation that the bequests to Jarrett Reeves resulted from her undue influence over Reeves before his death. The trial court found that Jarrett Reeves had indeed exerted undue influence and nullified all bequests to her. The trial court further dismissed Ms. Reeves as executrix of the Roger Reeves estate. For the following reasons, we reverse and remand.

DISCUSSION OF THE RECORD
Before the couple's 1980 divorce, decedent Robert Roger Reeves, Jr., an attorney and prominent member of the community of Harrisonburg, Louisiana, had ten children by his first wife, Dorothy Dale: Dorothy Ann *254 Reeves Faillace (Ann), Joan Reeves Lossin, Robert Roger Reeves (Bob), Mary Rebecca Reeves (Becky), John Cotton Reeves, Michael Reddick Reeves, Joseph McCleary Reeves, Sophie Sarita Reeves Holland (Sarita), Noah Blackstone Reeves, and Alma Roger Reeves Moss.
Not long after his divorce, Reeves met and began dating Jarrett Ganey Young, an acquaintance of decedent's daughter, Ann, who had recently separated from her husband. Roger and Jarrett were married on July 18, 1981, when Roger was sixty years of age, and Jarrett was thirty-eight.
After being married for approximately nine years, Roger Reeves was diagnosed with prostate cancer in 1990 from which he died on December 10, 1992, at age seventy-two. His statutory will dated September 16, 1992, left approximately one-half of his estate to Jarrett, including a lifetime usufruct over the children's ownership interest in Elmly Plantation. The remaining one-half of his estate was left to nine of his ten children. The will further named Jarrett as executrix and Lawrence Sandoz as the attorney for the succession.
One of the Reeves' children, Bob, was excluded from his father's will, leading him to file the instant suit to annul his father's will on March 15, 1993, alleging alternatively that the will was not properly executed and was a product of Jarrett Reeves' undue influence.[1] A five day trial concerning the alleged undue influence was held in July 1995. Based on the evidence, the trial judge found that Jarrett Reeves had indeed exerted undue influence and rendered judgment nullifying the bequests to his widow. Jarrett appeals this determination of the trial court.
Jarrett Reeves' appeal assigns the following errors:
1. The trial judge erred and committed manifest error in admitting the testimony, over timely objection, of a psychiatrist who had never seen the testator that undue influence existed at the execution of the testament which invalidated the bequest to wife since his opinion was not a psychiatric diagnosis.
2. The trial judge was clearly wrong in relying on the testimony of a psychiatrist who had never examined testator, who based his opinion on subjective information received from two daughters that the personality of their father changed during eleven years of second marriage, which invalidated bequest to wife based on undue influence.
3. The trial judge was clearly wrong and committed manifest error in ignoring the consistent pattern of five wills and a codicil prepared and executed by Testator over a period of eleven years that established a plan to divide assets between wife and children.
4. The trial judge committed manifest error in ignoring the testimony of long-time business associates of Testator, who testified concerning the relationship between Testator and wife, including no change in the personality of Testator as opposed to relying on post-mortem psychological autopsy of psychiatrist who never saw Testator.
5. The trial judge was clearly wrong in concluding that the evidence of the psychiatrist and two daughters of Testator established "clear and convincing" evidence of undue influence as required by Article 1483 of the Civil Code.
6. The trial judge committed manifest error in declaring the bequests to wife invalid due to undue influence when the record contains no evidence from doctors who attended testator that he suffered from mental problems that rendered him susceptible to undue influence.
Jarrett Reeves' maintains that the trial court erred in finding that undue influence was proven by clear and convincing evidence. In particular, Jarrett Reeves points to testimony indicating that, at the time of the execution of the will, Roger Reeves appeared to be acting of his own volition and was able to properly execute a will. Appellant argues that in rendering an adverse judgment, the *255 trial court incorrectly discounted the testimony of friends and business associates who had known the decedent both before and after his marriage to her, all of whom offered testimony in support of the testator's capacity.
In response to these charges, appellees remind us of the great deference to be accorded the trial court's findings of fact, which they suggest were adequately supported by the testimony of some of the children that their father had become increasingly isolated from them in latter years, and by a psychiatric autopsy performed by their retained expert, whose profile of decedent led him to conclude that decedent had indeed become vulnerable.

LAW

Present
Wills in Louisiana today may be voided on the authority of Louisiana Civil Code Articles 1478 or 1479.
Article 1478 provides for the nullification of wills upon grounds of fraud or duress.
A donation inter vivos or mortis causa shall be declared null upon proof that it is the product of fraud or duress.
La.Civ.Code art. 1479, on the other hand, provides for the annulment of a donation mortis causa on the more subtle grounds of undue influence.
A donation inter vivos or mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor.

(Emphasis ours).
There is precious little Louisiana jurisprudence on the topic of undue influence, as prior to the 1991 enactment Article 1479, such donations could not be annulled on this basis. Moreover, applying Article 1479 in pari materia with Article 1478 restated above is not without difficulty. Nonetheless, some insight may be drawn from the official Comment to La.Civ.Code art. 1479 and the experience of common law jurisdictions, who have long recognized the principle.
(b) This Article, like the preceding Article, presumes a donor who has capacity. Obviously, if a donor lacks capacity, then the entire donation or will is invalid for that reason alone, and issues of fraud and undue influence are irrelevant. This Article intentionally does not use the word "undue" to describe the influence (although the word is intentionally used in the title of the Article and in two later Articles that refer to this Article), but instead defines the influence as being of such a nature that it destroys the free agency of the donor. No single definition of "undue influence" has been found acceptable in all of the relevant legal writings. The common-law rules concerning "undue influence", fraud, and duress are derived almost entirely from case law rather than statutes. Any number of definitions exist in court opinions and in instructions to juries, but the law clearly deals largely with subjective elements, making the term "undue influence" therefore very difficult to define. In the case law, the objective aspects of undue influence are generally veiled in secrecy, and the proof of undue influence is either largely or entirely circumstantial. By referring to "influence" that impaired the volition of the donor, this Article attempts to indicate that the character of the gift or testamentary disposition itself is not determinative of the issue, although it may nonetheless be evidence on the issue. Moreover, everyone is more or less swayed by associations with other persons, so this Article attempts to describe the kind of influence that would cause the invalidity of a gift or disposition. Physical coercion and duress clearly fall within the proscription of the previous Article. The more subtle influences, such as creating resentment toward a natural object of a testator's bounty by false statements, may constitute the kind of influence that is reprobated by this Article, but will still call for evaluation by the trier of fact. Since the ways of influencing another person are infinite, the definition given in this Article is used in an attempt to place a limit on the kind of influence *256 that is deemed offensive. Mere advice, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of a donor and substitute someone else's volition for his own.

(c) The Article intentionally defines the influence as being that of the donee or some other person in order to avoid a challenge based solely on the workings of the donor's own mind without pressure from someone else. It seems obvious that the influence has to be exercised with the object of procuring a particular gift or bequest. While the influence may be exerted by the donee himself, the Article covers the situation where the donee takes no part in the activities (and may even be ignorant of them), so long as some person does exercise control over the donor, presumably one who is interested in the fortunes of the donee. (d) It is implicit in this Article that the influence must be operative at the time of the execution of the inter vivos donation or testament. Obviously, it should not be necessary that the acts themselves be done at that time, or that the person exercising the pressure be present then.
La.Civ.Code art. 1479 (Revision Comments b-d)(emphasis added).

History
Prior to the 1991 amendment, article 1492 was controlling with respect to allegations of undue influence. Succession of Dowling, 93-1902 (La.App. 4 Cir. 2/25/94); 633 So.2d 846. That provision provided that "[p]roof is not admitted of the dispositions having been made through hatred, anger, suggestion or caption."
Giving deference to this language, this circuit had adopted the view that evidence of undue influence could only be presented to show testamentary incapacity, but not as an independent basis for nullifying a will. Succession of Dowling, 633 So.2d 846, citing inter alia, Guidry v. Hardy, 254 So.2d 675 (La.App. 3 Cir.1971), writ denied, 260 La. 454, 256 So.2d 441 (1972). This view was not universally accepted, however, as other tribunals construed former Article 1492 to permit such evidence of undue influence to void wills, provided that it "must have been exercised upon the testator at the moment the will was executed, not before nor afterwards." Texada v. Spence, 166 La. 1020, 118 So. 120, 121 (1928). In accord, Succession of Hamiter, 519 So.2d 341, 344 (La.App. 2 Cir.), writ denied, 521 So.2d 1170 (La.1988).
Thus when Article 1492 was repealed by Act 788 of 1989 and later, Act 147 of 1990 it was well established that evidence of undue influence was admissible to prove testamentary incapacity, and at least some jurisprudence recognized it as grounds for nullifying a disposition if the influence occurred at the moment of making the disposition.
Succession of Dowling, 633 So.2d at 855.
However, this schism was effectively laid to rest by the addition of Article 1479, which is recognized to have created a new cause of action for nullifying a donation. Succession of Dowling, 633 So.2d 846. "By adopting that article the legislature has specifically recognized the cause of undue influence, in addition to incapacity, as a separate basis for nullifying a testamentary disposition." Succession of Dowling, 633 So.2d at 855.

Policy
Applying such an amorphous concept as "undue influence" is not made any easier by the high stakes involved, the absence of the testator, and society's heartfelt intent to care for the wishes of the fallen.
Strong policy considerations are ... involved when testamentary capacity is disputed. As the court stated in Kingsbury v. Whitaker, 32 La.Ann. 1055, 36 Am.Rep. 278 (1880):
"To wrest a man's property from the person to whom he has given it, and to divert it to others from whom he has desired to withhold it, is a most violent injustice, amounting to nothing less than post-mortem robbery, which no court should sanction, unless thoroughly satisfied... that the testator was legally incapable of making a will." 32 La.Ann. 1055 at 1062-1063.
*257 Succession of Lyons, 452 So.2d 1161, 1165 (La.1984).
Thus, a will is strongly presumed to have intended the effects of its stated intentions when it complies with the legal formalities imposed by the law. "A party is presumed to have testamentary capacity, and the opponent bears the burden of defeating this presumption by putting forth clear and convincing evidence to the contrary. Succession of Lyons, 452 So.2d 1161, 1166 (La. 1984)." Succession of Fletcher, 94-1426 (La. App. 3 Cir. 4/5/95); 653 So.2d 119, 121, writ denied, 95-1105 (La.6/16/95); 655 So.2d 338. In accord, Succession of Franz, 232 La. 310, 94 So.2d 270 (1957). To placate its unease, our legal regime imposes procedural safeguards to ensure that a testament indeed is enforced to reflect a testator's last will. For instance, those intending to have a will's terms disregarded for alleged want of capacity or "undue influence" are required to come forward not only with proof by a preponderance, but with clear and convincing evidence. La.Civ.Code art. 1483.
Proof by "clear and convincing" evidence requires more than "preponderance of the evidence," the traditional measure of persuasion, but less than "beyond a reasonable doubt," the stringent criminal standard. To prove a matter by "clear and convincing" evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. [Citations omitted].
Succession of Dowling, 633 So.2d at 855. In accord, Succession of Bartie, 472 So.2d 578 (La.1985); Succession of Fletcher, 653 So.2d 119.
The strong policy considerations reiterated above in Succession of Lyons, 452 So.2d 1161, remain applicable today, notwithstanding that at the time it was rendered, parties seeking to have a will voided were required to prove their case beyond a reasonable doubt, the same burden required to overcome the presumption of innocence in a criminal proceeding, whereas the law today only requires satisfaction of the lesser clear and convincing standard.[2]
No one doubts testator Reeves' compliance with the formal requirements of will drafting. More importantly, though, there is an absence of evidence to suggest that decedent Reeves was anything but a fully capable man who loved both his surviving spouse and his children and who freely chose to whom and in what proportions he would leave his estate. Consequently, we hold that the trial court erred in concluding that the testator was adequately susceptible to being inordinately susceptible to manipulation by his wife of eleven years.

Trial Court Ruling
In its written reasons, the trial court concluded that the record contained clear and convincing evidence that the testator's will was the product of Jarrett Reeves' volition rather than his own. Observing that La.Civ. Code art. 1479 offers little instruction as to what factors suggest the presence or absence of "undue influence," the trial court relied upon the following expression of common law jurisprudence in its analysis:
The elements that are set for in these common law cases have provided the court with substantial guidance in construing Article 1479 in the instant case.
"Most courts have listed four (4) elements as establishing a prima facie case of undue influence:
(1) Susceptibilitya person who is susceptible of being unduly influenced by the person charged with exercising undue influence.
(2) OpportunityThe opportunity of the alleged influencer to exercise such influence on the testator.
(3) Dispositiona dispositiona disposition on the part of the alleged influencer to influence the testator for the purpose of procuring an improper favor either for himself or another.

*258 (4) Coveted Resulta result caused by, or the effect of, such undue influence."[3]
After listing these four factors, the trial court concluded that Ms. Jarrett Reeves had exerted undue influence which voided the decedent's most recent will. Its finding was based almost exclusively on the opinion of psychiatrist, Dr. George Seiden, a forensic psychiatrist presented as an expert by the Reeves children. In particular, the trial court found that Dr. Seiden's psychiatric testimony supported a finding that decedent was susceptible to undue influence due to his sexual dependency upon Jarrett Reeves and his fear of abandonment.[4] Dr. Seiden opined that Roger Reeves was susceptible to influence due to his extreme need for love and sexual intercourse and, additionally, his need for companionship and his fear of being alone.
To support his conclusion, Dr. Seiden alluded to Roger's self-proclaimed need for intimacy with a woman, as testified to by family and friends, suggested that Roger was particularly vulnerable to the presence of a woman, particularly the type of woman Dr. Seiden characterized as "a rescuing, supportive woman who [would] pretty much [give Roger] what he wanted" because, although Roger offered "an appearance of confidence and assertiveness, but underneath [he had]... a sense of emptiness and dependency."
Dr. Seiden suggested that decedent's relationship with Jarrett fit the description:
Q: Was he dependent upon Jarrett Reeves for love and sex?
A: Yes, he was.
Q: Would you tell the Court, please, what was the level of Roger Reeves' dependence?
A: It was extreme, to the point thatthat he at times felt that he could not live without it.
To support his conclusion, Dr. Seiden alluded to Roger's reaction on a few occasions when he and Jarrett had disagreements (i.e. distraught, closed off from others, exhibited suicidal tendencies, etc.).

OPINION
The weight of the evidence and the public policies articulated above in Succession of Lyons, 452 So.2d 1161, compels us to reverse the judgment of the trial court.

I.
Initially, we observe that Ms. Jarrett Reeves was the testator's wife of eleven years, and while we are unable to categorically state that the charge of undue influence can never be leveled against a surviving spouse who is the main beneficiary of a testament by her spouse of eleven years, we do believe that a surviving spouse is not the intended target of Article 1479. Compare, e.g., Estate of Larsen, 7 Wis.2d 263, 96 N.W.2d 489 (1959) (Wisconsin Supreme Court: elderly widow showing signs of senility induced to transfer shares of stock to guardians, who later failed to contact her family in regards to her death and misstated size of estate in order to gain control of it). This is a classic case of undue influence in which the deceased, affectionately referred to as "Aunt Minnie," was prevailed upon to disinherit the "natural object of her bounty" in favor of more distant relatives.
*259 The two closest relationships that exist between persons are the relationship of parent to child and that of husband and wife. Either a spouse or a child is clearly a "natural object of a testator's bounty." Both the comments to La.Civ.Code art. 1479 and the jurisprudence which we have reviewed suggests that the purpose of legislation such as Article 1479 is to protect the "natural object of a testator's bounty" from being cheated out of an inheritance by a person who, in the normal course of events, would have little or no expectation of inheritance but who, by use of devious means, manages to convince the testator to do that which in his heart of hearts he did not will or intend.
In a case such as Estate of Larsen, the elements relied upon by the trial court in the present case, i.e., susceptibility, opportunity, disposition, and coveted results are meaningful and relevant and lead to a reasonable and desired result.
In a case such as the present case, however, where a spouse is the recipient of the testator's bounty, these elements are almost totally meaningless in determining whether a person might have exerted undue influence.
(1) Susceptibilityit is in the nature of a matrimonial relationship that the spouses are mutually bound to one another and should be responsive to the needs, desires and opinions of one another. A spouse is required by the nature of the relationship to be susceptible and sensitive to the desires of his or her mate. In a case such as Larsen where "Aunt Minnie" was staying with more distant relatives, susceptibility would be a meaningful concept. In a marital situation, the element of susceptibility is inherent in the relationship and has no bearing on the issue of use of undue influence.
(2) Opportunitypeople who live together as man and wife see each other daily, discuss all manner of business and personal relationships and have unlimited opportunity to influence one another. In a classic case such as Larsen, the opportunity of the outsider to influence the person becomes a very relevant inquiry when the person who inherits has little or no natural claim. In the case of a spouse, the existence of an opportunity to influence once again is inherent in the relationship, not contra bones mores, and is thus not relevant in determining undue influence.
(3) Dispositionthe element of disposition requires that the alleged influencer must have a disposition to procure "an improper favor" for himself or another. We would shake the bedrock of matrimonial law if we were to rule that the disposition of one's property to a spouse, to provide for the surviving spouse after the donor's death is in any way an "improper favor." Once again we note that such an inquiry would be meaningful in a classic case where the people who seem intent upon divesting the testatrix do not comprise the "natural object of a testator's bounty." But in the case of a spouse, this position would not be a meaningful inquiry as being cared for after the death of a spouse is not an "improper favor."
(4) Coveted resultthis, of course, begs the question as without the result there would be no inquiry in the first place.
A review of these elements suggests that they are meaningful in a case where property is left to a person when the natural object of a testator's bounty is passed over in favor of strangers or persons of much lower claims to consideration. What then would be the proper inquiry as to undue influence on the part of a spouse? Several come to mind: physical abuse, emotional abuse, fraud, deceit, or criminal conduct. Our review of the record suggests that none of these elements are present in this case.
We are told in the trial court's reasons for judgment that the undue influence of the spouse was that she was able to exploit the decedent's sexual dependency and fear of abandonment because of his extreme need for love and sexual intercourse and additionally, his need for companionship and his fear of being alone. A moment's reflection suggests that love, companionship and intimacy are the primary reasons that people marry, ergo, the marital imperatives.
*260 The court would note that had Mrs. Reeves been a paramour rather than a wife of eleven years, the court below might have been correct in finding that the need of the testator for love, companionship and sexual intimacy might have formed a basis for undue influence which might have been a solid ground for invalidating the will. In the case of a spouse, this is not so. The need for love, companionship and intimacy are among the foremost reasons for marriage. Each spouse owes these things reciprocally to one another. Either may and should expect love, intimacy and companionship and either might well be expected to be generous in making donations, either mortis causa or intervivos, to the other.
In the case before us, we are told that because of his need for love, companionship and sexual intimacy, the testator left his property to the person who gave these things to himhis wife of eleven years. We are told that if he had not been willing to include her in the will, she might have withheld the love, intimacy and companionship upon which he was so dependent. Thus, her desire to be included in the will, coupled with her ever-present ability to withhold intimacy, constituted a force strong enough to substitute her volition for his.
On public policy grounds, we decline to find these grounds adequate for reversing the stated will of the testator. Rather, we hold that the granting or withholding of love, companionship and intimacy are matters reserved to the good judgment of the member of the marriage unit; that either spouse is free at any time to ask for consideration on the part of the other, including the ability to ask for gifts, donations or inclusion in the will; and that ground rules for the granting or withholding of intimacy are best provided by the married couple rather than the civil courts. To be more specific, we hold that the granting or withholding of love, companionship and intimacy, i.e., the marriage imperatives, are matters reserved to the married couple and shall not, standing alone, serve to invalidate a will.

II.
Marital status is the primary reason that we feel compelled to reverse the judgment of the trial court. However, it is not the only reason.
Our review of the record shows that Dr. Seiden's opinions were based upon an incomplete picture of Mr. Reeves' personality, being derived not from his having conferred with the testator, but rather from the recollections of a few of his children. We find this evidence, while admissible, unequal to the task of dismantling the clear intent of the testator, particularly given the overwhelming weight of evidence, specifically the disinterested opinions of Mr. Reeves' personal physicians and the persons in whose presence the will was prepared. According to all of these persons who, unlike Dr. Seiden actually knew Mr. Reeves and not his caricature, Mr. Reeves retained his faculties to the very end of his life and prepared and signed the will in the absence of the accused meddler.
Ms. Muriel Davis, Mr. Reeves' counselor during his life, expressed her opinions that decedent did not feel as though he was overly susceptible to the domination of women and that the couple had an unexceptional second marriage. Moreover, when asked point-blank, Ms. Davis said she saw no undue influence. Similarly, Attorney Lloyd Love, a close friend of decedent's for some fifty years, saw nothing to suggest other than an "excellent" marital relationship, and with his own eyes saw that decedent, far from being vulnerable in his financial dealings, "handled his own business," even after his marriage to Jarrett. The disinterested and firsthand testimony of Davis and Love was buttressed by the testimony of Bob Alexander, the manager of the bank next to decedent's law office, who indicated that his fellow board member was always alert, active, and well-informed at Catahoula Bank board meetings, and by Barry Maxwell of another bank from whom decedent borrowed money in order to pay a debt to decedent's first wife. According to Maxwell, decedent very clearly laid out his financial status and, more importantly, left no question but that Jarrett would be in charge of his estate after his demise. Even by the deferential standards of appellate review, *261 we conclude that this overwhelming evidence clearly overcame the weight of evidence presented by Bob and the other children.[5]
In Succession of Lyons, 452 So.2d 1161, the court of appeal reversed the trial court's finding a will invalid. It differed with the trial court "not on credibility, but on the sufficiency of the evidence"and concluded that the trial court incorrectly found that the will's opponents had overcome the presumption of statutory capacity by the requisite measure.
We do likewise today, thus giving force to the articulated wishes of the testator.

III.
Thus, we reverse the judgment of the trial court on grounds of both law and evidence.

DISPOSITION
Because of the trial court's ruling, it was not necessary for the trial court to consider the merits of Bob Reeves' alternate contention, that the will contained bequests to Jarrett that were either impossible, illegal or immoral. Bob Reeves had filed an amended petition in which he sought not only a reduction of any excessive donation above the forced portion due free and clear of any usufruct in favor of Jarrett Reeves, but also sought a judgment declaring that his father's will contained certain impossible, illegal, or immoral conditions pursuant to La.Civ.Code art. 1519.
In view of our reversal of the trial court on the issue of undue influence, a remand is in order so that the trial court may consider the alternate grounds of relief raised by Bob Reeves, after additional briefing by the parties, including Jarrett and the other heirs who have yet to address them.

DECREE
For the foregoing reasons, the judgment of the trial court is reversed and this case is remanded. Costs of these proceedings to be determined following trial on the merits.
REVERSED AND REMANDED.
DOUCET, C.J., concurs in the result.
WOODARD, J., concurs and assigns written reasons.
AMY and YELVERTON, JJ., dissent and assigns reasons.
WOODARD, Judge, concurring.
I agree with Judge Saunders' opinion in all respects and wish us not to forget that, "[t]he cardinal principal of interpretation of acts of last will is to ascertain and honor the intent of the testator, ascribing meaning to a disposition so that it can have effect." La.Civ. Code arts. 1712, 1713, 2045-2050, 3531. Lingo v. Courmier, 95-542 (La.App. 3 Cir. 11/2/95); 667 So.2d 1091, 1093, writ denied 96-0795 (La.5/10/96); 672 So.2d 925.
As a seasoned practitioner of the law, Mr. Reeves was by no means ignorant of his rights and the legal procedures available to him regarding the ultimate distribution of his property. Even if we were to grant, arguendo, that he did not want to lose the favor of his wife, Jarrett Reeves, Mr. Reeves knew that, essentially, he could "have his cake and eat it too" by drafting an olographic will after his last statutory will. Those challenging his will have presented no competent and persuasive evidence to prove this not to be the case, especially given the overwhelming testimonies from objective third parties of his continued rational and independent thinking and functioning.
I believe Mr. Reeves knew exactly what his choices were, and he made one. It is not up to us to distribute his property the way we think he should have or the way we believe we would have.
AMY, Judge, dissenting.
I respectfully disagree with the majority decision. In my view, a spouse's manipulation *262 of "the marital imperatives" in an effort to create "resentment toward a natural object of [the] testator's bounty" was contemplated by our legislature when enacting La. Civ.Code art. 1479. Our codal provisions recognize and respect the intimacy shared between a husband and wife. A person challenging a donation mortis causa because of undue influence is required to prove his or her claim by the higher burden of proof, proof by clear and convincing evidence, unless the wrongdoer shares a relationship of confidence with the testator and is not "related to the donor by affinity, consanguinity or adoption." La.Civ.Code art. 1483. As such, any further differential treatment on account of public policy considerations is unwarranted. I believe that the legislature's recognition of the differential burden of proof where the wrongdoer is "related to the donor by affinity, consanguinity or adoption" is a clear expression that the public policy considerations behind La.Civ.Code art. 1479 were intended to include claims such as that brought in the instant case.
The trial court, after hearing extensive testimony, found that Jarrett Reeves had exerted undue influence over her husband so that her volition was substituted for his own, making the bequests to her in his will nullities pursuant to La.Civ.Code 1479. In particular, the trial court found that Dr. Seiden's psychiatric testimony supported a finding that the decedent was susceptible to undue influence due to his sexual dependency upon Jarrett Reeves and his fear of abandonment. Next, the trial court found that there was opportunity to unduly influence the decedent as he and his second wife lived alone and, further, there was evidence indicating that she sought to isolate him by limiting contact with his children. With regard to Jarrett Reeves' disposition, the trial court once again turned to the testimony of Dr. Seiden who opined that "Jarrett Reeves was a strong and opinionated individual with a high and sometimes violent temper who used threats of abandonment to influence Roger Reeves' financial decision making." The trial court also considered Dr. Seiden's opinion that "Jarrett Reeves was clearly preoccupied with obtaining Roger Reeves' assets and that she took pains to exert control over the management of those assets by involving herself repeatedly in decisions about finance." The trial court stated that "[t]he evidence introduced at trial clearly shows that Dr. Seiden's opinions were true."
Additionally, the record reveals that Jarrett Reeves routinely kept a diary during the second half of her marriage to Leo Young and during the eleven years she was married to Roger Reeves. At trial there was much speculation as to what the eight to ten diaries that Jarrett Reeves burned only five days before the instant suit was filed would have revealed. Jarrett testified that she did not destroy the diaries to avoid their contents being revealed in court, but instead because she was "bringing a phase of [her] life to a closure." Jarrett further testified that she had no idea suit would be filed and it was a mere coincidence that she burned the diaries shortly before Bob Reeves filed suit to annul the will. However, the trial court was not convinced given the fact that two of the Reeves children contacted the attorney for the succession, to discuss their displeasure and possibility of a suit being filed, prior to the destruction of the diaries. Accordingly, the trial court applied the "theory of spoliation of evidence" which provides for the presumption that the destroyed evidence contained information detrimental to the party who destroyed the evidence unless such destruction is adequately explained. Randolph v. General Motors Corp., 93-1983 (La.App. 1 Cir. 11/10/94); 646 So.2d 1019, writ denied, 95-0194 (La.3/17/95); 651 So.2d 276; Kammerer v. Sewerage & Water Bd. of New Orleans, 93-1232 (La.App. 4 Cir. 3/15/94); 633 So.2d 1357, writ denied, 94-0948 (La.7/1/94); 639 So.2d 1163.
Also of particular importance to the trial court were several excerpts from Jarrett Reeves' diary which had been misplaced by the Appellant and which the trial court found "disclosed Jarrett Reeves' intent to devise a plan to acquire Roger Reeves' assets, to keep John Reeves out of his father's law practice and to gain ownership of the Harrisonburg home." These excerpts, which were written in 1984, were found in a classroom at Northeastern University where Jarrett Reeves was attending college. These excerpts were *263 found, turned over to Roger Reeves' son, Joe, and kept without the knowledge of Jarrett Reeves. They were entered into evidence and were read into the record by the Appellant.
The trial judge, in his written reasons, stated: "The contents of these fragmented entries that were accidentally left by Jarrett Reeves in a Northeast Louisiana University classroom and the destruction and refusal to produce the vast preponderance of the diaries is very detrimental to the contentions of Jarrett Reeves." It is abundantly clear that the trial judge placed great weight on these expressions of Jarrett's thoughts, and that he found Jarrett's version of the relationship she shared with her husband to be less credible than that presented by the plaintiff.
The majority opinion, citing Succession of Lyons, 452 So.2d 1161 (La.1984), concludes that Bob Reeves did not overcome the presumption of statutory capacity by the requisite measure. However, testamentary capacity of Roger Reeves, a separate basis for nullifying a testamentary disposition, is not presently under review. While Roger Reeves' business associates testified that Jarrett was not present during negotiations for farm leases or bank loans, this does not necessitate a finding that Jarrett's influence was not present during these negotiations. As noted by Dr. Seiden, Jarrett's physical presence was not necessary. He testified that in areas that concerned the children or Roger's assets, Jarrett's influence was present throughout their eleven-year marriage. From the record, it appears that the witnesses in question did not have a familiarity with Roger Reeves on a personal basis, as did several other witnesses, whose testimony the trial judge accepted, who testified as to Roger and Jarrett's interaction at home, around the children, and any change in Roger's personality. Also, a large amount of evidence presented by the defense was directed toward Roger's mental capacity at the time the will was executed rather than the absence of any undue influence. As discussed previously, testamentary capacity is a separate and distinct issue. Furthermore, even with the heightened burden of proof, the official comments to La.Civ.Code 1479 recognize that "the objective aspects of undue influence are generally veiled in secrecy, and the proof of undue influence is either largely or entirely circumstantial."
The testimony of the Reeves' children, their spouses, and several longtime friends revealed that, after his marriage to Jarrett, they observed marked, and unexpected, changes in Roger's personality when interacting with his children. Some examples include: (1) the children had to call for permission before coming over to visit with their father; (2) Bob was required to visit his father at the law office, and was never allowed to visit when Jarrett was present; and, (3) the usual weekday family lunches at the "Granny House" were canceled, even at times Jarrett was away at work.
Also of note was the absolute omission of Bob Reeves from his father's will. It was undisputed at trial that Roger Reeves loved all of his ten children throughout the entire span of his life, and that Jarrett Reeves had problems with Bob and that she did not allow Bob to be around when she was present. There was testimony presented to illustrate Roger's disenchantment with Bob due to Bob's difficulty in farming Elmly and his alignment with his mother, Dorothy Dale, during litigation stemming from Roger Reeves' marriage to Dorothy. However, even accepting the above facts as true, throughout this same period of time, evidence was presented that indicated that Roger Reeves still loved his son and that his absence was because of Jarrett. Roger continued to seek ways to clandestinely preserve Bob's presence in his life. For example, Roger hired Bob to plant trees on sixty acres of Elmly Plantation in 1990, a year after Bob's farm lease was terminated and even longer after Bob was prohibited from visiting Elmly or being around Jarrett. More importantly, in hiring Bob to plant the trees, Roger was forced to do so without Jarrett's knowledge and required receipt and payment be made in the name of Roger Carter so that Jarrett would not find out. Sarita, Roger's daughter, testified that Roger admitted that this was necessary because Jarrett would not let him hire Bob. Additionally, before Bob's lease to farm Elmly was canceled, Dennis *264 Dosher, Roger Reeves' son-in-law, testified that Roger Reeves approached him about farming Elmly with Bob in hopes that Jarrett would be pacified. Dennis testified that Roger told him that "Jarrett wanted to get rid of Bob and [he] was trying to figure out some way to keep Bob on Elmly."
Additionally, Dr. Seiden described Jarrett's behavioral pattern as "random intermittent punishment" with her goals being control of Roger's financial assets and interaction with his children, and, most importantly, Dr. Seiden noted Jarrett's pattern of alienating or isolating Roger from his children. Considering the evidence of the children and others close to the decedent, as well as the overwhelming testimony of the forensic psychiatrist, Dr. Seiden, I conclude that the trial court was not manifestly erroneous in finding that the evidence presented was sufficient to support the claim that the bequests to Jarrett resulted from her undue influence over Roger before his death.
Accordingly, I respectfully dissent.
YELVERTON, Judge, dissenting.
I dissent for the reasons expressed by Judge Amy. I write separately to emphasize my disagreement with the statement in the majority opinion that "a surviving spouse is not the intended target of Article 1479." I think the law does not exclude anyone as a potential undue influencercertainly not second spouses, and particularly as in this case not a younger, second spouse with six children of her own.
Article 1479 was introduced by House Bill 882 of 1991. The minutes of the House Civil Law and Procedure Committee meeting on May 21, 1991, reveal that "Mr. Max Nathan, representing the Louisiana State Law Institute... stated that this bill was in response to the change in the law on forced heirship last year." The relationship between this bill and the eventual nigh-abolition of forced heirship has been studied by scholars. I believe that one of the legislative concerns in creating Article 1479 was "the protection of the donor's family, the `natural objects of his bounty,' from the harsh effects of disinheritance." See Comment, Louisiana's New Law On Capacity To Make And Receive Donations: "Unduly Influenced" By The Common Law? 67 Tul.L.Rev. 183, 184 (1992).
The virtual abolition of forced heirship was a statement of preference for the common law freedom of testation. With forced heirship gone, actions such as undue influence are essentially the only means left to protect the donor and his family. The legislature adopted a common law remedy in providing for undue influence. In an oral presentation made at Loyola University School of Law Forced Heirship Symposium on January 31, 1997, published in 43 Loy.L.Rev. 43, 48, Professor Katherine Spaht put it this way: "Once forced heirship was eliminated for most children, which is what we have, the legislature understood that to avoid the possibility of legalized theft, we would have to do as our opponents of forced heirship had long criedthat is, become like the other forty-nine states, permitting the litigation of undue influence." We should look to the common law for guidance in applying Article 1479. The trial judge did that in deciding this case.
The trial court conducted a five-day trial, heard 20 witnesses, evaluated the evidence and the credibility of witnesses, and found clear and convincing proof of undue influence. The trial court gave thoughtful and scholarly reasons for judgment. It is our duty to affirm this purely factual, reasonable determination.
NOTES
[1] The other Reeves children filed a second petition alleging that Jarrett's share exceeded the legally disposable portion and seeking a reduction of the excess donation and recognition of their forced portion free and clear of any usufruct.
[2] Moreover, although in this case Mr. Reeves died in 1992, if anything, the strong policy considerations favoring the testator's will has risen in stature since 1995, where their adult children above the age of twenty-three express misgivings as to a parent's postmortem dispositions, since Louisiana law no longer accords them forced heirship preference except in cases of infirmity.
[3] See, e.g., In re Estate of Aageson, 217 Mont. 78, 702 P.2d 338 (1985); Folsom v. Folsom, 601 S.W.2d 79 (Tex.Civ.App.1980); In re Estate of McGonigal, 46 Wis.2d 205, 174 N.W.2d 256 (1970); Estate of Larsen, 7 Wis.2d 263, 96 N.W.2d 489 (1959).
[4] The trial court also found that there was opportunity to unduly influence the decedent, as the couple lived alone and his wife, Jarrett, deliberately sought to isolate Mr. Reeves from his children. With regard to Jarrett Reeves' alleged disposition, the third factor, the trial court once again relied upon the testimony of Dr. Seiden who opined, without ever meeting the widow or the testator, that "Jarrett Reeves was a strong and opinionated individual with a high and sometimes violent temper who used threats of abandonment to influence Roger Reeves' financial decision making" and "took pains to exert control over the management of those assets by involving herself repeatedly in decisions about finance." In the trial court's view, this predisposition could also be inferred from certain passages contained in the widow's diary and from the destruction of other diaries previously in her possession. Finally, the trial court concluded that the desired result had been achieved.
[5] The excerpts from Jarrett's diary filed into evidence, far from comprising a "smoking gun" revealing Jarrett's undue influence on her husband, offer a contemporaneous reflection of the stress she was feeling, from her relative youth, her fear for her future without her husband, and her and her husband's financial affairs. Moreover, they clearly state her love for her husband and her belief that he loved her.