CARAWAY, J.,
dissenting.
hi respectfully dissent and would reverse the annulment of the testator’s will.
Appellant (“Dianne”) first argues at great lengths that the clear and convincing standard under La. C.C. art. 1483 for the burden of proof was not properly applied by the trial court in this case and that Louisiana’s application of the manifest error standard of appellate review will likely compound the error further. Dianne asserts that blind adherence to the manifest error standard, requiring only a “reasonable fact basis” for judgment, makes the clear and convincing burden meaningless on appeal.
I believe both standards have application in the following manner for this circumstantial evidence case. Since proof of intent and the volition of the testator, outside of the testament itself, rests exclusively on circumstantial evidence,[2] there may *436 be competing, yet undisputed, bodies of reasonable evidence which imply the motive or state of mind of the testator.[3] Here, while the Appellees, Robert and David Cook (hereinafter sometimes referred to as “the brothers”), may have sufficiently proven a body of circumstantial facts suggesting Dianne’s undue influence over their father, Joseph, simply | applying the manifest error standard of review to that evidence alone is not the end of the inquiry. Dianne’s defense produced an opposing body of circumstantial evidence from which her father’s intentions and volition for his will may also be inferred. This evidence raises a competing inference; a competing hypothesis for their father’s intent. That body of evidence should likewise be reviewed to determine if it rests on undisputed facts and gives rise to reasonable inferences of a different motive for Joseph’s act. To the extent that the evidence of the brothers’ actions in June 2012, demonstrate circumstantially another reasonable hypothesis for the father’s state of mind for his July will, the clear and convincing standard for their burden of proof may not be met.
It should also not go unnoticed that backing up Dianne’s proof- for the testator’s intent is the solemn act for the testament itself that occurred in proper form in this case.[4] The attorney who prepared the will and acted, as notary testified that Joseph discussed with him his desires for the will’s preparation and, of course, acknowledged the testament as his will at its execution. Additionally, there is the implied recognition in Article 1483 that one child or spouse in a close caregiver relationship with the testator is never deemed to have exerted an undue influence because of that relationship in the absence of clear and convincing proof to the contrary. See, In re Succession of Culotta, 04-1298 (La.App. 5th Cir.3/1/05), 900 So.2d 137, writ denied, 05-0817 (La.5/13/05), 902 So.2d 1024.[5]
*437 As a threshold matter, the trial court ruled without discussion of the facts that Joseph did not lack capacity to execute the will. On Joseph’s final visit with his family physician on January 8,'2013, the doctor noted Joseph’s “good judgment and insights.” Nevertheless, at age 91, Joseph exhibited some memory problems and had an Alzheimer’s dementia diagnosis by mental testing in 2011. With this ruling by the trial court of contractual capacity, albeit with some mental issues, the two opposing views for. Joseph’s mental state in July 2012 would appear to me to be equally affected by Joseph’s condition. Just as he could be more susceptible to an undue influence of the daughter, he could also overreact to the actions by the brothers in ousting his control over the family corporation, Rodidaco.
The trial court ruled that Rodidaco was the center of the family tensions. Surprisingly, however, the brothers, as the plaintiffs and the controlling shareholders in the company, did not detail or dispute the father’s role as president of the .company since its inception in the late 1970s. More importantly, despite another important act pf Joseph in July of 2012 — his $408,0Q0 lawsuit against Rodidaco — the brothers did not challenge this debt Rwith ■ their corporation’s records, or the lack thereof. The brothers’ position at trial was that they had never known of a $408,000 debt while at the same time acknowledging their father’s control in the creation and management of the corporation for many years. The petition for Joseph’s suit alleged that payments from the company to Joseph on the debt had been periodically made through the years.. There was testimony by David that Joseph received payments and was “living out of the corporation.” Before Joseph’s ouster as president in June 2012, Joseph had asserted a claim to money owed to him by the company in connection with the disputed tower sale.
With the accounting records for the company in the brothers’ control, was there a debt or not? If there was a debt, then Joseph was informed of .two things in June 2012: (1) He was no longer the president of-Rodidaco by his sons’ unannounced actions, and (2) his $408,000 asset in -the form of the corporate debt might not be repaid with his loss of control of the company. On the other hand, if Dianne had concocted a fiction of a $408,000 debt in her father’s mind that is not supported by the company’s accounting records, then that manufactured $408,000 falsity is further evidence of her undue influence over Joseph. The brothers did not try to dispute their father’s claim ,to the debt by accounting evidence within their control. They only admitted that since the company had been in their father’s control for years, they had never known about such debt. Part. of Dianne’s defense regarding her father’s state of mind for his will was that her father directed attorneys to file a suit on a $408,000 debt. The brothers did not try to show through .a review of all corporate records that the suit was frivolous. As 1 ^plaintiffs in this action, with the burden of proof, the brothers’ evidence did not challenge the circumstantial evidence that Joseph was very disturbed about his claim for $408,000.
In addition to this undisputed evidence of the father’s $408,000 claim, the brothers admitted that their father exhibited great anger .at Robert and Robert’s daughter, Michelle, in late June or early July, only days after the brothers’ ouster of Joseph as president of Rodidaco on June 19. The purpose of Robert’s visit was to try and explain to Joseph why the brothers had *438 removed him as president. Michelle described her grandfather, as “screaming” and threatening “to attack us.” Robert explained that Joseph “was furious because he believed we had stolen something from him.”
This tragic encounter, a few days before Joseph’s execution of , his will, can hardly be asserted as the product “of Dianne’s undue influence. From the testimony of Robert, Michelle and Dianne, Dianne was not even present. The incident clearly pertained to Joseph’s knowledge of the brothers’ actions against his interest in Rodidaco. The. strong inference from this fit of anger over the brothers’ actions with Rodidaco is that the brothers’ actions served as the motivation for their exclusion by Joseph in his July 17 will.
Under the manifest error measure of these facts, the brothers do not dispute that Joseph’s outburst of anger, just days before executing his will, was related to his removal as the president of Rodidaco on June 19, 2012. A reasonable inference by this defense evidence, thus, overhangs the brothers’ case. Proof of Joseph’s state of mind for his will may be inferred from his ganger over the brothers’ actions with Rodidaco. Significantly, the trial court’s reasons for judgment did not specifically mention the brothers’ action in removing Joseph as president, his angry encounter with Robert and Michelle, or Joseph’s $408,000 suit and explain how Dianne’s undue influence somehow completely produced Joseph’s exhibited anger shown in those matters.
On the other hand, when the evidence is viewed most favorably to the brothers’ case, there is a strong showing of Dianne’s control over her father from 2010 when she moved to live next to Joseph. This, coupled with her clearly strained relationship with her brothers, produces the competing inference that Dianne was exerting undue influence on Joseph’s . decisions. Nevertheless, drawing the line between Dianne, as primary caregiver and circumstantial manipulator of Joseph’s decisions, and Joseph’s independent anger toward his sons, is not a task for the fact finder’s determination by direct evidence. Reasonable inferences for one’s state of mind must be weighed, and sometimes the weight of each clouds the conclusion to be gleaned from the other. It'is significant to me that with all the family tension and hard feelings exhibited between the siblings leading up to the June 19, 2012 ouster of Joseph as president, Joséph had never chosen to change his mil; or from the brothers’ perspective,' Dianne had never motivated her father to change the will. Likewise, before his ouster, the independent outburst of anger Joseph rendered toward his son in the presence of his granddaughter and outside of Dianne’s presence had never previously occurred.
|7In conclusion, proof of state of mind is rarely established by direct evidence. That is certainly true with a testator allegedly under an undue influence .despite his solemn act. When I search this record for the circumstantial evidence bearing on Joseph’s state of mind, there is evidence that tends to prove an undue influence by Dianne. Yet, if another hypothesis for the testator’s intent rests on other reasonable circumstantial evidence, I cannot say that the brothers’ claim óf undhe influence by Dianne has been proven to be highly probable and therefore clear and convincing. I think that evidence surrounding the brothers’ own actions in removing their father as president of the company is a strong body of undisputed circumstantial evidence for his motive in removing his sons from his will. The brothers’ hypothesis for their father’s manipulated motive for his will does not exclude the reasonable hy *439 pothesis of Joseph’s independent anger against them.

. When intent is disputed in a civil or- criminal action, proof of intent or state of mind is *436 rarely established as a fact by direct evidence, but may be inferred from the facts regarding the individual's actions or other circumstances. S.G. v. City of Monroe, 37,103 (La.App.2d Cir.4/11/03), 843 So.2d 657; Schmidt v. Blue Cross and Blue Shield of Louisiana, Inc., 33,910 (La.App.2d Cir.9/27/00), 769 So.2d 179, writ denied, 00-3011 (La.12/15/00), 777 So.2d 1234; Ledet v. Burgess, 93-600 (La.App. 5th Cir.2/9/94), 632 So.2d 1185. See also, State v. Sosa, 05-0213 (La.1/19/06), 921 So.2d 94; State v. Graham, 420 So.2d 1126, 1127 (La.1982) and Justice Lemmon’s concurrence in Succession of Talbot, 530 So.2d 1132 (La.1988).

.In the analogous criminal law statute for the even higher burden of proof for a crime, La. R.S. 15:438 recognizes different circumstantial bodies of evidence that raise competing inferences for multiple hypotheses for a vital fact, as follows: "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”

. There is a presumption in favor of the validity of testaments in general, under Louisiana law. In re Succession of Holbrook, 13-1181 (La.1/28/14), 144 So.3d 845. A will is strongly presumed to have intended the effects of its stated intentions when it complies with the legal formalities imposed by the law. Succession of Reeves, 97-20 (La.App. 3d Cir. 10/29/97), 704 So.2d 252.

. The appellate court in Culotta reversed the trial court judgment invalidating a will on the grounds of undue influence finding that the sister failed to prove her brother’s undue influence by clear and convincing evidence. The elderly testator suffered from dementia "at times, when he was agitated.” When he expressed a desire to stop living with his daughter, the testator’s son and his wife came to live with him in his home. While there, the father utilized the services of the son's attorney to change a previous will to make the son his sole heir. After considering the evidence presented by both sides, including medical and legal testimony, the court reversed the trial court after determining that the execution of the testament was well with *437 in the discretion of the testator who vehemently opposed living with his daughter and cleárly expressed his desire that his daughter -and grandchildren receivé nothing.